515 F.2d 998
 169 U.S.App.D.C. 281, 10 P.U.R.4th 310
 SAM RAYBURN DAM ELECTRIC COOPERATIVE, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Gulf States Utilities
Company,Intervenor.
MID-SOUTH ELECTRIC COOPERATIVE ASSOCIATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Gulf States Utilities
Company,Intervenor.
 Nos. 73-1996, 73-2167.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 21, 1974.
Decided July 11, 1975.
 
 1
 Northcutt Ely, Washington, D. C., with whom Frederick H. Ritts, was on the brief, for petitioner Sam Rayburn Dam Elec. Co-op.
 
 
 2
 William Wise, Washington, D. C., for petitioner Mid-South Elec. Co-op.
 
 
 3
 Thomas M. Walsh, Atty., F. P. C., Washington, D. C., with whom Leo E. Forquer, Gen. Counsel and George W. McHenry, Jr., Sol., Washington, D. C., were on the brief, for respondent F. P. C.
 
 
 4
 Benny H. Hughes, Jr., Beaumont, Tex., was on the brief for intervenor Gulf States Utilities Co.
 
 
 5
 Before DANAHER, Senior Circuit Judge, WILKEY, Circuit Judge, and JUSTICE,* United States District Judge for the Eastern District of Texas.
 
 JUSTICE, District Judge:
 
 6
 Petitions for review of certain orders of the Federal Power Commission[1] have been filed by Sam Rayburn Dam Electric Cooperative[2] and Mid-South Electric Cooperative,[3] pursuant to Section 313(b) of the Federal Power Act,[4] and consolidated for consideration by the court. The intervenor, Gulf States Utilities Company,[5] supplies electric power to Sam Rayburn and Mid-South under the provisions of contracts of long standing. On April 10, 1973, Gulf States filed with the FPC a request for a rate increase affecting its wholesale customers, among them Sam Rayburn and Mid-South. Both petitioners filed protests and motions, demanding that the FPC reject the proposed rate increase. Subsequent orders[6] of the FPC had the effect of permitting the increase with respect to specified power supplied to the petitioners by Gulf States; the petitioners seek review of those orders before this court. We reverse the decision of the FPC in each case and remand them to the FPC with instructions.THE GULF STATES SAM RAYBURN CONTRACT
 
 
 7
 The Southwestern Power Administration,[7] formed in 1945 under the Flood Control Act of 1944,[8] bears the responsibility for dispensing the power generated at federal dams in Missouri, Oklahoma, Kansas, Texas, Arkansas, and Louisiana. At the time that the electric power generating facilities of the Sam Rayburn Dam and Reservoir Project on the Angelina River in Texas were in the planning and construction stages, the SPA entered into negotiations with both Gulf States and a then-existing cooperative known as Tex-La Electric Cooperative concerning the disposition of the Dam's electric power. Particular members of the Tex-La Cooperative would not have been served by any arrangement with the SPA or Gulf States; consequently, there was considerable sentiment that the Tex-La group should build or contract for its own electric generating facilities. As the negotiations became less fruitful, the Administrator suggested that those members of Tex-La who could benefit from the Dam's electric generating capacity form their own organization. Accordingly, the Sam Rayburn Dam Electric Cooperative, Inc., was formed. Its members included four municipalities and two electric cooperatives.[9]
 
 
 8
 Under Section 5 of the Flood Control Act of 1944,[10] electric cooperatives are entitled to preference in the purchase of electric power from federal dams. Sam Rayburn, however, was not well-placed to utilize this advantage, because it controlled no lines for the transmission of power from the Dam. Gulf States, on the other hand, owned lines capable of transmitting power from the Dam, but did not enjoy preferred customer status. With the encouragement of the SPA Administrator, Sam Rayburn and Gulf States negotiated an agreement whereby Sam Rayburn would buy power at the dam site from the SPA and resell it immediately, for the same price, to Gulf States. The latter would, in turn, furnish power service to the members of Sam Rayburn.
 
 
 9
 Several contracts were necessary to effectuate this arrangement. Sam Rayburn entered into a contract with the SPA for the purchase of the dam site power at a stated monthly rate, with increases to be negotiated no more frequently than every five years (beginning no earlier than July 1, 1970). The contract included a provision giving Sam Rayburn an option to terminate the contract, if a proposed increase should be unacceptable. Sam Rayburn also signed contracts with each of its members, municipal and cooperative, setting forth the respective duties and privileges of the organization and its members. All of these contracts referred to the provisions of the final contract necessary to the arrangement, i. e., the contract between Sam Rayburn and Gulf States.
 
 
 10
 All the parties to the Sam Rayburn-Gulf States contract now concede that the "draftsmanship evidenced by the contract leaves much to be desired." The scheme of the contract places in separate articles the provisions for "Sale of Power and Energy by the Company[11] to Sam Dam Co-op[12] for Delivery to Certain Specified Member Municipals" (Article 3) and "Sale of Power and Energy by Gulf States to the Sam Dam Co-op for Delivery to Certain Specified Rural Electric Distribution Cooperatives" (Article 4). Under each Article, a subsection 4 contains the provisions for "Compensation by the Sam Dam Co-op to Gulf States."
 
 
 11
 Subsection 4 of Article 3 provides that Sam Rayburn shall compensate Gulf States monthly for energy delivered to municipal members according to an attached rate schedule, "SR-1". It provides, in addition, that Sam Rayburn may negotiate for modification of the SR-1 rates, if the SPA lowers the cost of power at the dam site, and that Gulf States may negotiate for modification, if the SPA increases dam-site cost. Further, this provision stipulates that a change in SPA charges gives one party a privilege to open negotiations for a rate change; if the parties are unable to agree on a new rate, the party with the privilege of negotiation may cancel the entire contract.
 
 
 12
 Subsection 4 of Article 4 provides that Sam Rayburn must compensate Gulf States for power delivered to its cooperative members at rates set by a second rate schedule, denominated "SR-2". Like its counterpart in Article 3, it contains a renegotiation clause, but renegotiation privileges with respect to SR-2 rates need not be triggered by a change in SPA pricing. Rather, under the provisions of Article 4, Gulf States may make a written request for renegotiation any time after January 1, 1970, but not more often than once every five years; if the parties are unable to agree on a modification of SR-2 rates after a renegotiation request from Gulf States, than Gulf States may, at its sole option, cancel the entire contract on thirty-six months' notice. It should be noted that Sam Rayburn has no renegotiation or cancellation privileges under Subsection 4 of Article 4.
 
 
 13
 In addition to the involuted, conjoint stipulations already mentioned, Subsections 4 of both articles contain the following identical provision:
 
 
 14
 (c) If a rate increase or decrease should be made applicable to the service rendered by Gulf States to the Sam Dam Co-op hereunder by final order or by acceptance for filing by Gulf States of any regulatory body having jurisdiction thereof, such increased or decreased rates shall be applicable to such service rendered hereunder from and after the effective date of such rate change.
 
 
 15
 This language is the source of the controversy among Sam Rayburn, Gulf States, and the Federal Power Commission.
 
 
 16
 In companion cases of FPC v. Sierra Pacific Power Co.[13] and United Gas Pipe Line Co. v. Mobile Gas Service Corp.,[14] the Supreme Court announced the so-called Sierra-Mobile doctrine. It there ruled that, except in rare cases,[15] the Federal Power Commission has no power under the Federal Power Act[16] or the Natural Gas Act,[17] to accept for filing rates that contravene existing contracts. This court has applied and reaffirmed the doctrine consistently, most recently in City of Richmond v. FPC.[18] The Sierra-Mobile doctrine does not, of course, dictate that unilateral rate changes may never be accepted by the Commission. In United Gas Pipe Line Co. v. Memphis Light, Gas and Water Division,[19] the Supreme Court made clear that the Commission has power to accept unilateral rate changes for filing, when they are submitted by a seller that, in contracting with its customers, has "reserved to (itself) the power to make rate changes in this manner."[20]
 
 
 17
 When Gulf States attempted to file its 1973 revised rate schedule, the question then presented to the FPC was whether Gulf States had reserved the power in its contract with Sam Rayburn to effect rate changes by unilateral application to a regulatory agency. The Commission ruled that the language of Subsections 4(c) of Articles 3 and 4 of the contract, quoted above, did grant Gulf States that privilege, and accordingly it permitted the proposed increase to go into effect. Approaching this decision of the Commission with the deference to which it is entitled,[21] we still are constrained to disagree with it.
 
 
 18
 An examination of various features of the contract itself, as well as certain extrinsic material (consideration of which is proper because of the arguably ambiguous nature of the contract provisions),[22] points inescapably to the conclusion that the language of Subsections 4(c) of Articles 3 and 4 was intended by the parties to reflect, first, an acknowledgment that even an agreed-upon rate increase would necessarily be subject to the final approval of the appropriate regulatory agency; second, an understanding that such an increase could not become effective until the agency so ordered.
 
 
 19
 At the outset, it is instructive to compare the language of the two Subsection 4(c) provisions with the language of the other contract provisions concerning rate changes. Article 3, Subsection 4(b), which contains the renegotiation clause for SR-1 rates, requires that such rates "shall be reviewed and redetermined by the parties hereto" at the time of any change in SPA rates. Article 4, Subsection 4(b), concerning the privilege of Gulf States to ask for renegotiation after 1970 at five year intervals, contains the same "shall be reviewed and redetermined" language. In contrast, the language of the 4(c) subsection of each article is in the subjunctive: "If a rate increase or decrease should be made applicable . . ." It is certainly not usual for the existence of important contractual rights and obligations to be alluded to in a dependent grammatical clause, yet never set forth directly. Had the parties intended for 4(c) to provide an independent method for effecting a rate change, it appears more likely that they would have so indicated unequivocally, in language similar to that in the 4(b) provisions. Rather, the placement of the 4(c) language after the two contract provisions relating to rate changes, together with its conditional grammatical structure, indicate unmistakably that it refers to a method of implementing a rate change that has been negotiated pursuant to one of the 4(b) provisions.[23]
 
 
 20
 It is important to note the manner in which Gulf States' and the FPC's interpretation of the contract would affect Sam Rayburn's obligations pursuant to it: The contract has no time limit; it lasts for eternity, absent cancellation. The 4(b) provisions leave Sam Rayburn with a method of escape: Sam Rayburn may cancel the contract, if the prices demanded by Gulf States exceed Sam Rayburn's willingness or ability to pay them. But the interpretation of 4(c) contended for by Gulf States would mean that, if the FPC should grant its approval of a unilateral rate increase by Gulf States, Sam Rayburn would have no apparent remedy or relief from its perpetual obligation under the contract. It seems wholly implausible that the officers acting for Sam Rayburn would have been so derelict or imprudent as knowingly to bind the organization to this provision, since, if so construed, it would be manifestly disadvantageous and prejudicial to Sam Rayburn's interests.
 
 
 21
 In construing 4(c), a comparison of the rights and liabilities of Sam Rayburn's members before and after the tripartite agreement is enlightening. Prior to the negotiation of the SPA-Sam Rayburn-Gulf States tripartite agreement, all of the members of Sam Rayburn, both cooperative and municipal, were customers of Gulf States. The cooperative members had contracts with Gulf States that clearly did not permit unilateral rate changes, as the FPC recognized.[24] The municipal members, on the other hand, apparently had contacts contemplating that Gulf States could unilaterally modify its rate schedule by seeking the approval of the FPC for such an increase in other words, Memphis-style contracts.[25] (The complete contracts between the municipal members and Gulf States are unfortunately not before the Court, not having been made a part of the record.) All of these contracts were suspended by Gulf States and the members for the duration of the Sam Rayburn-Gulf States contract, as a condition of the tripartite agreement. Sam Rayburn thus argues that it is absurd to suppose that the two cooperative members would have surrendered their rights under Sierra-type contracts for participation in a Memphis-type pact. Gulf States counters that it is equally nonsensical to presume that Gulf States would have foregone its rights under its four Memphis contracts with the municipalities in exchange for a Sierra agreement with Sam Rayburn.
 
 
 22
 There appear, however, to be two possible explanations favoring Sam Rayburn's contention and refuting that of Gulf States. First, the affidavit of the former Administrator of the SPA suggests that Gulf States was willing to abandon its Memphis contracts with the four municipalities to enter into a Sierra-type agreement with Sam Rayburn, because it would thereby eliminate the possibility that the cooperative and the government would make arrangements for the delivery of electric power without Gulf States' participation. This is a convincing explanation, since it cannot be denied that government-supplied power was perceived as a threat by many Southwestern utilities in the past.[26] Yet there is a second possibility that the surrender of Gulf States' rights under its Memphis contracts with municipalities was not a serious concession, because the contracts were cancellable at specified times by the municipalities. There is language in the suspension clauses of the Sam Rayburn-Gulf States contract suggesting that this was the case. Article 3, Subsection 2(b) of that contract, which suspended the contracts between Gulf States and the municipalities for the duration of the tripartite agreement, provides:
 
 
 23
 Any such contract with a member municipal shall be reinstated in full force and effect in the event this contract is terminated, or in the event service to such Member Municipal is otherwise discontinued under this contract, prior to the earliest date such Member Municipal could have terminated its contract with Gulf States for electric service at the time of such suspension. (Emphasis supplied)[27]
 
 
 24
 As stated, the Gulf States-municipality contracts are not contained in the record before us, but it appears almost certain, from the quoted language, that they were cancellable by the municipalities at intervals. If the intervals were reasonably short, there is great force to Sam Rayburn's argument that Gulf States would have had little to lose by exchanging its existing agreements with the municipalities for a Sierra-type contract with Sam Rayburn. Moreover, if the Administrator's suggestion is correct, Gulf States might have had a great deal to gain from the exchange. No theory has been advanced, on the other hand, that could account for a decision by the member cooperatives to relinquish their Sierra contracts with Gulf States for Memphis-type arrangements. These extrinsic considerations reinforce the unmistakable sense of the language of the Sam Rayburn-Gulf States contract, i. e., that it was always intended by both parties to create a Sierra-type agreement.
 
 
 25
 Finally, the affidavit of the former Administrator of the SPA, which stands uncontroverted in the record, states his understanding of the Sam Rayburn-Gulf States contract at all times: neither party could unilaterally change the existing rates by filing a new rate schedule. The affidavit of the President of Sam Rayburn, who participated in the contract negotiations, deposes that, "At no time was it ever suggested that either party would have the right to unilaterally change the rate of compensation . . . Instead, we intended to have a change in compensation every five years by mutual agreement."
 
 
 26
 These affidavits were never considered by the FPC,[28] apparently because it took the position that the contract unambiguously bestowed on Gulf States the power to effect unilateral rate increases through application to the FPC. This position is indefensible. The FPC's distaste for the Mobile-Sierra doctrine is well known,[29] and it has been in the past necessary for this court to remind the FPC that it is not free to ignore the doctrine.[30] Here, as in past cases, the FPC has "attempted what may charitably be termed an 'end run' "[31] around the doctrine by straining to transform a contract that is unmistakably of the Sierra variety into a Memphis-type agreement. In view of the plain import of the contract language and the extrinsic materials available to this court for consideration, the FPC's decision is reversed. The case is accordingly remanded to the FPC, not for reconsideration, but with instructions to reject the proposed increase in rates for the supply of power pursuant to the Sam Rayburn-Gulf States contract.
 
 THE GULF STATES MID-SOUTH CONTRACT
 
 27
 The petitioner, Mid-South, entered into a contract with Gulf States in 1950 for the delivery of electric power. The original contract provided that Gulf States' maximum monthly commitment to Mid-South was 200 kilowatts, but granted Mid-South the right to request an increase of up to 300 kilowatts monthly, subject to Gulf States' privilege of designating the delivery points for the additional power. As the years passed, however, Mid-South's power needs grew, and Gulf States always furnished whatever power Mid-South required. In 1960, the earliest year for which figures are available, Gulf States delivered 1374 kilowatts to Mid-South during the peak month. The peak-month supply grew each year between 1960 and 1973, when it reached 11,940 kilowatts.
 
 
 28
 At the time Gulf States filed its 1973 request for a rate increase, Mid-South protested to the FPC, on the ground that its contract with Gulf States was of the Sierra variety and did not permit unilateral rate changes to be accomplished merely by regulatory approval. The FPC ruled that the contract between Mid-South and Gulf States, as well as several other contracts, was indeed of the fixed-rate or Sierra type. Referring to these contracts, the FPC's order of June 14, 1973, states: "With regard to deliveries in excess of the maximum contractual commitments of Gulf States under these fixed-rate contracts, we shall accept the new rates applied for herein as an initial filing . . . ." Mid-South did not apply for rehearing or reconsideration with respect to the June 14 order, assertedly because its officials and attorneys believed that the extended course of dealing between Mid-South and Gulf States had effected an abrogation of Gulf States' initial "maximum contractual commitment" and substituted, instead, a commitment for Gulf States to supply Mid-South's total requirements. Thus, Mid-South expected that the order would not affect the rates for any power supplied to it by Gulf States. This expectation was short-lived.
 
 
 29
 On August 7, 1973, the FPC entered an order denying the applications for rehearing of certain other customers of Gulf States, a copy of which was directed to Mid-South. That order contained the following language:
 
 
 30
 ". . . Whether or not Gulf States has in fact been supplying amounts of electric energy in excess of the maximum contract demand in the Company's FPC Rate Schedule . . . does not in any way alter the fact that only the Company's contract as filed with this Commission, along with any properly filed and accepted amendments, can be regarded as embodying the presently effective contractual rates, terms, and conditions . . . We do not believe . . . that the Commission must be bound by practices carried on by the parties outside the contractual terms as presently filed with the Commission, where such practices are entirely without Commission knowledge or approval . . . where amounts of energy are proposed to be sold outside the contract demand parameters, the rates proposed for such sales may be viewed as an initial rate . . . ."
 
 
 31
 Alarmed to discover that the FPC intended its June 14 language respecting "maximum contractual commitments" to refer only to those commitments evidenced by a paper contract on file with the FPC, Mid-South immediately filed an application for rehearing, dated August 20, 1973. Its application explained that this document had not been filed immediately after the June 14 order, because it was not until the August 7 clarification of that order that Mid-South believed itself to have been affected by the June ruling.
 
 
 32
 Section 313(a) of the Federal Power Act[32] provides that a person aggrieved by an order of the FPC may file an application for rehearing within thirty days after the issuance of the order,[33] and that no proceeding to review an order of the FPC may be maintained unless the person who seeks to maintain it shall have first applied to the FPC for rehearing on the order. The FPC, taking the view that Mid-South's application for rehearing related to its June 14 order, denied the application as being untimely. We are now urged by the FPC and by Gulf States to dismiss Mid-South's petition for review on the ground that Mid-South has failed to meet the jurisdictional requirements of Section 313(a).
 
 
 33
 It is not at all clear, in the first place, that Mid-South was " aggrieved" by the order of June 14, rather than the order of August 7, within the meaning of the Act. There appears to be little reason to disbelieve Mid-South's claim that it did not read the June 14 order as a ruling that it would be required to pay Gulf States' new proposed rate for all energy deliveries exceeding 300 kilowatts per month. It is a familiar principle of the law that parties may evidence a modification of the original terms of a contract by their subsequent conduct,[34] and Mid-South had no apparent reason to anticipate that the FPC would declare itself not to be bound to observe that principle in applying the Sierra-Mobile doctrine.[35] Its speedy filing of an application for rehearing after the August 7 order apprised it of the FPC's position lends credence to its claim, viz., that it was not until the August order that it became clear to Mid-South that the June order would materially affect the rates it was paying for its electric service. There is no imaginable reason that Mid-South could have benefited from a "circumvention"[36] of the FPC's procedural rules by deliberately delaying the filing of its motion for reconsideration. The policy requiring timely filing of motions for reconsideration is one of fairness to the FPC and to parties affected by its order; only a perversion of that policy could be used to cut off the rights of a party that filed its application in good faith, as soon as it could reasonably have become aware of the import of an FPC order. Endorsement of the position that the FPC takes would permit an administrative agency to enter an ambiguous or obscure order, wilfully or otherwise, wait out the required time, then enter an "explanatory" order that would extinguish the review rights of parties prejudicially affected.
 
 
 34
 This court is not without authority to consider the equities of Mid-South's situation. In a similar case involving the National Labor Relations Board, the Supreme Court said:
 
 
 35
 The jurisdiction to review the orders of the Labor Relations Board is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action. The purpose of the judicial review is consonant with that of the administrative proceeding itself, to secure a just result with a minimum of technical requirements.[37]
 
 
 36
 Accordingly, we hold that Mid-South's application for rehearing was timely filed, that it complied with the requirements of Section 313(a), and that we have jurisdiction over its petition for review.
 
 
 37
 Turning to the substantive contentions of the parties, we first address the argument advanced by Gulf States and the FPC that Sierra's language relative to the integrity of "contracts" refers only to such contracts as are properly filed with and recognized by the FPC. The claim is thus made that the Sierra-Mobile doctrine does not bar a utility from initiating a unilateral rate change, even if it has a fixed-rate contractual obligation, so long as the obligation is not evidenced by documents accepted for filing by the FPC. This court has recently and firmly rejected that argument. In Borough of Lansdale, Pa. v. FPC, we said:
 
 
 38
 The Commission must summarily reject rate filings inconsistent with outstanding fixed-rate contracts whether or not the contracts have been filed with the Commission.[38]
 
 
 39
 Although Lansdale concerned an existing contract that had been reduced to writing and had been tendered to the FPC for filing, there is not a scrap of language in the opinion suggesting, as the FPC argues, that the decision is limited to attempted abrogations of written contracts that have been tendered to and rejected by the FPC. To the contrary, Lansdale contained a great deal of very expansive language concerning the FPC's duty to respect contractual obligations of whatever nature. We summarized the position of the FPC therein as follows:
 
 
 40
 It is contended that the Sierra-Mobile doctrine applies only to contracts previously accepted as lawful by the Commission.[39]
 
 
 41
 Our disposition of that contention was wholly unambiguous: "We have concluded that (this) argument misstates the law".[40]
 
 
 42
 In Lansdale, we further discussed the statutory duty of utilities to reduce their contractual obligations to writing and submit them to the FPC for filing.[41] We held that the failure of Lansdale's supplier to perform this duty did not absolve it of its responsibility to abide by the unfiled contract's terms, nor did it relieve the FPC of its obligation to respect them:
 
 
 43
 Breach of the filing obligation gains the company nothing, for rates established in a fixed-rate contract become effective for regulatory purposes even if the company bound by the contract neglects to file it.[42]
 
 
 44
 Lansdale is thus dispositive of several aspects of Mid-South's petition for review. If the conduct of Gulf States and Mid-South did effect a modification of the rights and obligations of the parties as originally set forth in the 1950 agreement, Gulf States was under a duty to notify the FPC of the pertinent modifications. It may be that this obligation was met by the filing of "Form 1 Annual Reports", which informed the FPC each year of the sales that were made to Mid-South by Gulf States and reflected the steadily increasing amounts; we need not decide the point at this time. In any event, if the parties did by their conduct subsequently modify the 1950 contract, Gulf States and the FPC are bound by the modified terms, whether or not Gulf States met its responsibility of reducing the modifications to writing and filing them with the FPC.
 
 
 45
 In addition to the arguments rejected in Lansdale, the FPC advances the additional contention that it is not possible for parties to electric supply contracts who are subject to the FPC's regulatory authority to modify their contractual arrangements by subsequent conduct. This is an unacceptable position. Contract law has long recognized that parties to a contract may vary its terms by a subsequent course of conduct.[43] In Matanuska Valley Farmers Cooperating Ass'n v. Monaghan,[44] it was held that the conduct of a dairy cooperative and its members subsequent to the execution of a written contract served to create an agreement to modify the original terms of the contract. The court states in its opinion:
 
 
 46
 It is well established that parties to a contract can, by mutual agreement, modify or rescind a contract and adopt in its stead a new agreement. An agreement to change the terms of a contract may be shown by the conduct of the parties, as well as by evidence of an explicit agreement to modify.[45]
 
 
 47
 Numerous other cases from various jurisdictions have set forth the same rule.[46] The law of Texas, where both Mid-South and Gulf States were chartered and the setting for performance of the contract, recognizes the possibility of modification evidenced by subsequent conduct.[47] The FPC has suggested no reason that the recognized law governing contracts should be ignored merely because the subject matter of a contract falls under the jurisdiction of the FPC. It is certainly no more burdensome for the FPC to examine and evaluate the conduct of the parties to a contract, when necessary, than it is for the courts to do so.
 
 
 48
 Accordingly, we hold that FPC was under a duty, at the time of Gulf States' attempt to increase its rates with respect to Mid-South, to ascertain whether or not the proposed increase conflicted with any existing contractual arrangement between Gulf States and Mid-South. Such an inquiry would necessarily include an evaluation of Mid-South's claim that their mutual course of dealing served to effect a modification of the terms of the written contract on file with the FPC. In remanding this case to the FPC, we leave to it the initial determination of whether such a modification did in fact occur.[48]Accordingly, the FPC is instructed to conduct proceedings consistent with this opinion.
 
 
 49
 Reversed and remanded with instructions.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(d)
 
 
 [1]
 Hereinafter "FPC"
 
 
 [2]
 Hereinafter "Sam Rayburn"
 
 
 [3]
 Hereinafter "Mid-South"
 
 
 [4]
 16 U.S.C. § 825l (b) (1970)
 
 
 [5]
 Hereinafter "Gulf States"
 
 
 [6]
 The Commission's order of June 14, 1973, set forth for the first time its conclusion that the contract between Sam Rayburn and Gulf States permitted the proposed rate increase. Its order of August 7, 1973, denying Sam Rayburn's application for rehearing reaffirmed its earlier decision
 
 
 [7]
 Hereinafter "SPA"
 
 
 [8]
 16 U.S.C. § 825s (1970); see 16 U.S.C. § 825s-1 (1970)
 
 
 [9]
 The municipalities are Vinton, Louisiana; Jasper, Texas; Liberty, Texas; and Livingston, Texas. The cooperatives are Sam Houston Electric Cooperative and Jasper-Newton Electric Cooperative. The original contracts between Sam Rayburn and the SPA and Sam Rayburn and Gulf States apparently contemplated that a third cooperative, the Southwest Louisiana Electric Membership Corporation, would become a member of Sam Rayburn, but, insofar as the record reflects, that expectation was not realized
 
 
 [10]
 16 U.S.C. § 825s (1970)
 
 
 [11]
 The contract used this abbreviation for Gulf States
 
 
 [12]
 The contract used this abbreviation for Sam Rayburn
 
 
 [13]
 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956)
 
 
 [14]
 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956)
 
 
 [15]
 The Commission is empowered, under § 206(a) of Title II of the Federal Power Act, to prescribe a change in existing contract rates whenever it determines that existing rates are unjust or unreasonable. There is no contention in this case that the rates fixed by the existing contract between Sam Rayburn and Gulf States are either. The Commission may also reject a newly filed contract, if after a hearing it finds that the contract is not in the public interest, pursuant to § 205(e)
 
 
 [16]
 16 U.S.C. § 791a et seq. (1970)
 
 
 [17]
 15 U.S.C. § 717 et seq. (1970)
 
 
 [18]
 156 U.S.App.D.C. 315, 481 F.2d 490, cert. denied, Indiana & Michigan Electric Co. v. Anderson Power and Light of City of Anderson, Indiana, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973)
 
 
 [19]
 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958)
 
 
 [20]
 Id. at 114, 79 S.Ct. at 200. Contracts reserving such a right to the seller are thus known as Memphis or Memphis-type contracts; contracts lacking such a provision are described as Sierra or Sierra-type agreements
 
 
 [21]
 See 358 U.S. at 114, 79 S.Ct. 194; North Atlantic Westbound Freight Ass'n v. Federal Maritime Comm'n, 130 U.S.App.D.C. 122, 397 F.2d 683 (1968); but see Public Service Comm'n v. FPC, 141 U.S.App.D.C. 174, 177, 436 F.2d 904, 907 (1970)
 
 
 [22]
 C. McCormick, Evidence § 219 (1954); 13 Tex.Jur.2d Contracts § 397 (1960); Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504 (1942). The Sam Rayburn-Gulf States contract contains a provision stipulating that the contract is to be interpreted and enforced according to Texas law
 
 
 [23]
 Similar language appears again in the contract in Article 7 Section 1: "This Contract shall not become effective unless and until the rates, compensation, and terms and conditions, provided in both this contract and in the SPA-Sam Dam Co-op Contract are confirmed and approved by such state or federal regulatory bodies having jurisdiction and required by law to accept, confirm, and/or approve such rates, compensation, and terms and conditions. . . ."
 
 
 [24]
 See "Order Suspending Proposed Rate Increase, Setting Matter for Hearing, and Instituting an Investigation Under Section 206" (FPC Docket No. E-8121, June 14, 1973) at 4 n. 4
 
 
 [25]
 Gulf States so contended in its brief, and Sam Rayburn conceded the point in its reply brief
 
 
 [26]
 See Kansas City Power & Light Co. v. McKay, 115 F.Supp. 402 (D.D.C.1953), in which certain private utility companies attacked the formation of the SPA as a conspiracy to undercut their market positions in the Southwest
 
 
 [27]
 The suspension clause relative to the member cooperatives, whose contracts with Gulf States clearly provided for optional cancellation at the end of a five-year period, contains precisely the same language
 
 
 [28]
 The Commission clearly could have considered the affidavit as evidence under its own rules. 18 C.F.R. § 1.26 (1974)
 
 
 [29]
 See Borough of Lansdale v. FPC, 161 U.S.App.D.C. 185, 191, 494 F.2d 1104, 1110 (1974) ("(t)he FPC very much dislikes the Sierra Mobile doctrine,"); City of Richmond v. FPC, 156 U.S.App.D.C. 315, 322, 481 F.2d 490, 497 (1973). (". . . the Commission simply does not understand, or more likely is not willing to abide by, the fundamental principle of the Sierra Mobile Memphis decisions."); Philadelphia Electric Co. (FPC Docket No. E-7795, January 4, 1973) at 4 ("We now add as a guideline for this and future proceedings that inasmuch as we consider fixed rate contracts in general to be not in the public interest it is our intent to strictly construe such existing contracts so as to permit no enlargement of rights or obligations thereunder absent a clear showing of necessity to meet the public interest."); Carolina Power & Light Co., 47 F.P.C. 1, 4 (1972) (". . . in our judgment the Mobile-Sierra rule is inconsistent with sound regulatory policy. That rule has the effect of limiting our authority under Section 206(a) of the Federal Power Act.")
 
 
 [30]
 City of Richmond v. FPC, 156 U.S.App.D.C. 315, 481 F.2d 490, cert. denied, Indiana & Michigan Electric Co. v. Anderson Power and Light of City of Anderson, Indiana, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973)
 
 
 [31]
 Id. at 320, 481 F.2d at 495
 
 
 [32]
 16 U.S.C. § 825l (a) (1970)
 
 
 [33]
 This requirement is also codified in the Commission's Rules of Practice, Rule 1.34(a), 18 C.F.R. § 1.34(a) (1974)
 
 
 [34]
 See notes 43-47 infra and accompanying text
 
 
 [35]
 We do not consider that simply because another party, the Southwest Louisiana Electric Membership Corporation, was sufficiently alarmed by the language of the June 14 order to file its application for rehearing on the grounds now urged by Mid-South, we must rule that Mid-South is held to a standard of equal zealousness. The test is not whether the most tireless of advocates might have foreseen the possibility that the Commission would take the position that it did, but whether Mid-South was unreasonable in assuming that it would not
 
 
 [36]
 This characterization is found in Gulf States' brief
 
 
 [37]
 Ford Motor Co. v. NLRB, 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939). See also Natural Gas Pipeline Co. v. FPC, 128 F.2d 481, 484 (7th Cir. 1942) ("We think it well settled that in respect to review of orders of Federal Boards and Commissions, the jurisdiction of the Circuit Courts of Appeals, when granted by Congress, is original rather than appellate in character and that, being endowed with original jurisdiction, the court may by its own orders protect the rights of the parties in any manner in which any trial court of equity of general jurisdiction might do so in an injunction suit.")
 
 
 [38]
 161 U.S.App.D.C. 185, 195, 494 F.2d 1104, 1114 (1974)
 
 
 [39]
 161 U.S.App.D.C. at 187, 494 F.2d at 1106
 
 
 [40]
 161 U.S.App.D.C. at 188, 494 F.2d at 1107
 
 
 [41]
 161 U.S.App.D.C. at 194, 494 F.2d at 1113
 
 
 [42]
 Id
 
 
 [43]
 See, e. g., 3A Corbin, Contracts § 524 at 297 (1960) ("A promisor, even though his promise has been put into clear written words, can always add to it, modify it, or wholly replace it by a subsequent tacit agreement, one in which his own promises are found wholly by inference from conduct other than words."); 17 Am.Jur., Contracts § 466
 
 
 [44]
 188 F.2d 906, 13 Alaska 323 (9th Cir. 1951)
 
 
 [45]
 Id. at 909
 
 
 [46]
 See cases cited at 17A C.J.S. Contracts § 375 nn. 97.15-98
 
 
 [47]
 13 Tex.Jur., Contracts, § 271 (1960); Wood Motor Co. v. Nebel, 150 Tex. 86, 238 S.W.2d 181 (1951); Stowers v. Harper, 376 S.W.2d 34 (Tex.Civ.App. Tyler 1964, writ ref. n. r. e.)
 
 
 [48]
 Even assuming that it finds that Mid-South and Gulf States did modify their contract by subsequent conduct, the FPC, of course, retains its authority to reject the proposed modification of a utility's contractual obligations, if it finds, pursuant to § 205(e), that the proposed change is not in the public interest. 161 U.S.App.D.C. at 195, n. 43, 494 F.2d at 1114 n. 43. Certain procedural difficulties might arise from the attempted use of § 205(e) authority to review modifications that do not come to the attention of the FPC until long after they have become effective as between the parties. It may be, however, as noted in the text, that the filing of annual reports reflecting the ever-increasing amounts of energy being sold to Mid-South by Gulf States did constitute adequate notice to the FPC of a change in their contractual arrangement. In that case, the question would arise whether the FPC may scrutinize any modifications pursuant to § 205(e) many months after the modifications were first submitted to it. We think that these questions are most appropriately left for the initial consideration of the FPC. Should it find that a hearing under § 205(e) would be permissible with respect to any modifications of the contract between Mid-South and Gulf States, it should keep in mind the Supreme Court's admonition that a contract is not contrary to the public interest simply because it may be unprofitable to the utility that entered into it. FPC v. Sierra Power Co., 350 U.S. 348, 355, 76 S.Ct. 368, 100 L.Ed. 388 (1956). That admonition applies equally to a review of existing rates pursuant to § 206(a)