### GULF STATES UTILITIES COMPANY, Petitioner,

### v.

### FEDERAL POWER COMMISSION, Respondent,

**Southwest Louisiana Electric Membership Corporation, Intervenor.**

### No. 74–1160.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1975.

Decided Aug. 22, 1975.

Petition for review of an order of the Federal Power Commission.

Benny H. Hughes, Beaumont, Tex., for petitioners.

Thomas M. Walsh, Atty., F. P. C., with whom Leo E. Forquer, Gen. Counsel, George W. McHenry, Jr., Sol., and John H. Burnes, Jr., Atty., F. P. C., were on the brief for respondent.

John Schwab, Baton Rouge, La., for intervenor.

Before TAMM ꞌ and LEVENTHAL, *Circuit Judges,* and MILLER,* *Judge,*

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. There is some dispute over the figure in the original contract. SLEMCO reads the figure as 8,900 while Gulf State believes it to be 8,000. We use the 8,000 figure for convenience, and without intending to resolve the dispute. The difference is of no significance for this appeal.

2. Order Suspending Proposed Rate Increase, Setting Matter for Hearing, and Instituting an

Opinion for the Court filed by *Circuit Judge* LEVENTHAL.

LEVENTHAL, *Circuit Judge*:

In July of 1950 Gulf States Utilities Company (Gulf States) and the Southwest Louisiana Electric Membership Cooperative (SLEMCO) entered into a contract for the supply of electrical energy by Gulf States to SLEMCO. That agreement, which set a maximum demand ceiling of some 8,000 kilowatts,[1] was held by the Federal Power Commission, on June 14, 1973, to be a fixed-rate contract that barred unilateral rate increases by the supplier for deliveries of electricity.[2]

In its order of October 19, 1973, denying SLEMCO's application for rehearing of the June 14th order, the Commission interpreted an August 1970 letter agreement modifying the 1950 contract as removing the demand ceiling, thus making all energy supplied by Gulf States to SLEMCO subject to the contract and to the fixed contract rates.[3] We are asked to review this interpretation of the 1970 agreement. We affirm the conclusion of the Commission.

### I. LEGAL BACKGROUND

The Federal Power Act, 16 U.S.C. §§ 824 *et seq.* (1970), requires, in § 205(c),[4] that every public utility file schedules of its rates and charges for sales subject to the Commission's jurisdiction. Section 205(d)[5] prohibits any change in previously filed rates from taking effect except by filing with the Commission, after thirty days' notice upheld FPC's determination and § 205(e)[6]

Investigation Under Section 206, in Docket No. E–8121, June 14, 1973, Supp. J.A. 2–9.

3. Order Denying Rehearing, in Docket E–8121, October 19, 1973, Supp. J.A. 27–28.

4. 16 U.S.C. § 824d(c) (1970).

5. 16 U.S.C. § 824d(d) (1970).

6. 16 U.S.C. § 824d(e) (1970).

authorizes the Commission to suspend the new rates for up to five months pending a hearing on whether the change is just and reasonable. Section 206(a)[7] allows the Commission, upon its own motion or upon complaint, to hold a hearing on whether a rate is "unjust, unreasonable, unduly discriminatory or preferential" and to fix a new rate if the filed rate is found to be unlawful.

■■■ The Supreme Court has held that these provisions do not authorize the Commission to approve unilateral rate increases that are inconsistent with a seller's contractual obligations. *See* United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); FPC v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). Rather, they provide "only for *notice* to the Commission of the rates established by the natural gas companies"—either *ex parte* or through negotiation, as the particular contract provides—"and for *review* by the Commission of those rates." United Gas Pipe Line Co. v. Mobile Gas Service Corp., *supra,* 350 U.S. at 343, 76 S.Ct. at 380. The Commission has the power, under § 206(a), to require a rate change not agreed to by the parties, but its sole concern in such a proceeding is "whether the rate is so low as to adversely affect the public interest . . . as distinguished from the private interests of the utilities." FPC v. Sierra Pacific Power Co., *supra,* 350 U.S. at 355, 76 S.Ct. at 372. If the contract between the parties reserves to the seller the privilege to change the rate unilaterally, there is no bar to Commission acceptance, subject to its review powers under §§ 205(e) and 206(a). United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division, 358 U.S. 103, 79 S.Ct. 194 (1958).

We have said:

The rule of *Sierra, Mobile* and *Memphis* is refreshingly simple: The contract between the parties governs the legality of the filing. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid.

Richmond Power & Light v. FPC, 156 U.S.App.D.C. 315, 318, 481 F.2d 490, 493, *cert. denied sub nom.* Indiana & Michigan Electric Co. v. FPC, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 472 (1973). Thus, in deciding whether to accept a filing of a rate increase made unilaterally by the seller the Commission must decide whether the parties intended to allow such unilateral changes or whether the contract established a fixed rate that can be changed only through mutual negotiation.

## II. THE FACTUAL SETTING

The original contract between Gulf States and SLEMCO for the furnishing of electricity was framed in 1950. Article III, paragraph B of that contract set an initial maximum commitment of 5,700 kilowatts, which could be increased up to 8,000 kilowatts. In article I, five points of delivery were established, with a "maximum capacity" in terms of kilowatts specified for each point. The contract provided that, "[u]pon written application by Customer and if agreeable to Company, additional points of delivery may be established . . .." Article V provided that SLEMCO should pay "for all electric energy furnished hereunder at the rates . . . set forth in Rate Schedule REA, attached. . . ." and that, [it is further agreed that] should SLEMCO sell to any consumer "other than those specified in the availability clause of Schedule REA, such schedule shall no longer apply." In that case a new rate shall be negotiated, and if "parties fail to agree on a proper applicable rate, then said agreement shall be cancelled."

Between March of 1951 and July of 1963, the 1950 contract was amended six times by letter agreements that made changes and additions in delivery points but made no increase in the maximum

7. 16 U.S.C. § 824e(a) (1970).

commitment. However, Gulf States routinely delivered electricity to SLEMCO far in excess of the contract maximum. In 1962, 35,579 kilowatts were delivered; in 1963, 45,090 kilowatts; and in 1970, 99,437 kilowatts.

In April of 1973, Gulf States filed new rate schedules with the FPC that would increase all its wholesale rates effective June 15, 1973. These schedules were to affect Gulf States' contract with SLEMCO, as well as its contracts with other customers. In its filing Gulf States said that most of its contracts expressly contemplated unilateral rate increases and that, where the contract did not provide for unilateral increases, the new rates were to apply to deliveries in excess of the maximum contractual commitment.

In a separate docket, on May 4, 1973, Gulf States filed the letter agreement of August 1970 that modified and extended the 1950 contract with SLEMCO, as amended through July of 1963. That agreement specified *inter alia* that "Company will interpret language of the [contract] to be no less favorable than would be the case if Exhibit A . . . were incorporated . . . ." Exhibit A contained four paragraphs. The first specified that Gulf States "will provide additional capacity . . . as [SLEMCO's] Normal Load Growth warrants . . . ." The second provided for the supply of "additional capacity, over and above Normal Load Growth" in certain circumstances. The third established arbitration procedures for disputes that might arise under specified portions of the first two paragraphs. And the fourth allowed the abandonment of points of delivery or the reduction of capacity if the "capacity so abandoned or reduced is to be delivered from another Point of Delivery" supplied by Gulf States.

In an Order of June 14, 1973, the FPC accepted Gulf States' proposed rate schedule, but found the SLEMCO contract to contemplate fixed rates within the terms of the *Mobile-Sierra* doctrine. The schedule was accepted as an initial filing for deliveries in excess of the maximum commitment established in the 1950 contract, and a § 206 investigation was instituted to determine whether the rates fixed by that contract were in the public interest. Gulf States made no application for rehearing of this Order, but SLEMCO asked for reconsideration, urging, among other grounds, that the Commission's decision ignored Gulf States' long-standing practice of delivering electric power in excess of its maximum contractual commitment and that it failed to recognize that the 1970 letter agreement eliminated the contract ceiling. The Commission responded that it was not bound by the past delivery practices of the parties, and deferred consideration of the effect of the letter agreement pending action on that filing. SLEMCO petitioned for judicial review of this order, but subsequently dismissed its appeal.

## III. THE FIXED RATE CHARACTER OF THE 1950 CONTRACT

In oral argument before this court, Gulf States contended that the 1950 agreement, including the 1970 extension and modification, does not impose a fixed-rate obligation under the *Mobile-Sierra* doctrine because it provides, in article XI, that the agreement "is subject to all valid laws and governmental regulations . . ." Gulf States did not appeal the FPC's June 1973 ruling to the contrary, and the matter would, under ordinary circumstances, be res judicata.

However, Gulf States argues that the res judicata effect should extend only to the maximum specified in the 1950 contract. To find the June order to be res judicata for all deliveries would be unfair, Gulf States claims, for it did not know when the Commission's decision was rendered that the decision would not only affect the relatively small amount specified in the 1950 contract (less than ten per cent of Gulf States' total deliveries to SLEMCO), but would be extended

to cover volumes in excess of 100,000 kilowatts.

In Stebbins v. Keystone Insurance Co., 156 U.S.App.D.C. 326, 481 F.2d 501 (1973), we held that the conventional rule that collateral estoppel applies to both of two independent grounds upon which a judgment is expressly rested should not be followed when one of the grounds is failure to exhaust administrative remedies. In so holding we considered the probability that the bound party had acquiesced in the earlier judgment because "one ground . . . does not finally adjudicate the case on its merits but operates . . . to permit continued or future litigation . . . ." 156 U.S.App.D.C. at 333, 481 F.2d at 508. We noted that the purpose of collateral estoppel is to avoid waste of judicial resources and that it would stand "that principle on its head to maintain, in effect, that a party must fully litigate each and every issue solely for the purpose of avoiding collateral estoppel," even where he is otherwise willing to accept the result. Id.

Gulf States may have chosen to acquiesce in the Commission's June 14th Order on the assumption that its impact was relatively minor, having no effect on future deliveries beyond 8,000 kilowatts, at least as Gulf States understood its

import. SLEMCO filed its application for rehearing, which may have been the first signal to Gulf States that the FPC might interpret the letter agreement as expanding its contractual commitment, on July 13th, the eve of the expiration of the thirty-day time period in which Gulf States could file a petition for reconsideration. 18 C.F.R. § 1.34(a) (1974). Under these circumstances Gulf States has a strong argument, under the principle of Stebbins, that its understanding of the impact of the June 14th order was reasonable and that, while it is foreclosed from attacking the June 14th order (as to 8,000 kilowatts), it may not fairly be foreclosed from challenging the Commission's characterization of the contract as fixed-rate insofar as that is extended, by the October 1973 order, to apply to all deliveries to SLEMCO.[8]

Assuming arguendo that the fixed-rate characterization could be reviewed at this time, we find no merit in Gulf States' contention. Gulf States' argument derives from the provision in the 1950 contract that the agreement "is subject to all valid laws and regulations . . . ." This language, in article XI, is straight-forward, and its clear import is simply to acknowledge existing regulatory authority,[9] e. g., the notice requirement and review provisions spelled out by the Court in United Gas Pipe Line

---

**8.** The FPC instituted a § 206 hearing to determine if the rates fixed by the 1950 contract are unlawful, and thus left open the possibility that a higher rate may eventually be required. However, relief to Gulf States through a § 206 hearing is very limited. The Supreme Court has held that it is not sufficient, in such a hearing, to find that a rate yields a low rate of return. Rather, as we noted above, the Commission must find that "the rate is so low as to adversely affect the public interest . . ." FPC v. Sierra Pacific Power Co., supra, 350 U.S. at 355, 76 S.Ct. at 372. See also Landsdale v. FPC, 161 U.S.App.D.C. 185, 192–93, 494 F.2d 1104, 1111–12 (1974).

**9.** Compare Sam Rayburn Dam Electric Cooperative v. FPC, 169 U.S.App. 281, 515 F.2d 998 (Nos. 73–1996, 73–2167, July 11, 1975), where Gulf States raised a similar argument on the basis of a more ambiguous clause in its contract with Sam Rayburn Dam Electric Cooperative, Inc., that provided:

> If a rate increase or decrease be made applicable to the service rendered by Gulf States to the Sam Dam Co-op hereunder by final order or by acceptance for filing by Gulf States of any regulatory body having jurisdiction thereof, such increased or decreased rates shall be applicable to such service rendered hereunder from and after the effective date of such rate change.

The Commission had ruled that this language reserved to Gulf States the privilege to effect rate changes by unilateral filing. Although the language was somewhat ambiguous we determined that, in context, it reflected only "an acknowledgment that even an agreed-upon rate increase would necessarily be subject to the final approval of the appropriate regulatory agency [and] an understanding that such an increase could not become effective until the agency so ordered." 169 U.S.App.D.C. at 286, 515 F.2d at 1003.

Co. v. Mobile Gas Service Corp., *supra,* 350 U.S. at 343, 76 S.Ct. 373.[10] Only a tortured reading could discern in its phrasing a reservation of power to change rates unilaterally, and to be a blanket override of the provision in the first paragraph of Article V that SLEMCO "shall pay . . . for all electric energy furnished hereunder at the rates . . . set forth in Rate Schedule REA, attached hereto . . . ."

■ Our conclusion that the 1950 contract was a fixed rate contract is fortified by the structure of Article V ("Rates"). Following the first paragraph, quoted above, that SLEMCO shall pay "for all electric energy furnished hereunder at the rates . . . set forth in Rate Schedule REA attached . . .," the second paragraph provides that if SLEMCO sells to new customers, "other than those specified in the availability clause of Schedule REA," the parties shall negotiate a rate; and if they fail to agree on a rate, the agreement shall be cancelled. This indicates to us that if there are no new customers, the REA rate schedule applies. Gulf States has not offered any plausible explanation of why the parties should require negotiation of a rate for new customers if Gulf States already had a general right to post new rate schedules without SLEMCO's agreement.

We now proceed to the question of whether the parties intended to leave the contractual maximum at the level specified in the 1950 contract, or whether, as the FPC ruled, they subsequently removed the contract ceiling, extending the terms of the contract, including the rate provisions, to deliveries in excess of the specified level.

## IV.  THE EFFECT OF DELIVERY PRACTICES

In its June 1973 order, the Commission failed to find that Gulf States' long-standing practice of making deliveries in excess of the contractual maximum removed the contract ceiling. SLEMCO, Intervenor before this court, asked the Commission to consider this point in its application for rehearing of the June order but, on February 4, 1974, dismissed its appeal from the FPC's refusal to grant rehearing. Prior to dismissal, SLEMCO's appeal was consolidated with the cases decided in Sam Rayburn Dam Electric Cooperative v. FPC, 169 U.S. App.D.C. 281, 515 F.2d 998, (Nos. 73–1996, 73–2167, July 11, 1975).[11]

Mid-South Electric Cooperative, another Gulf States customer which has a contract identical to SLEMCO's and had similarly received deliveries of electric power far in excess of the contract maximum, pressed the matter before our court. We remanded, holding that the Commission was required to evaluate

**10.** Gulf States argues that, since the contract was formed between two parties doing business in Louisiana, article XI contemplates the application of Louisiana law, which permits unilateral rate increases for contracts under the state regulatory commission's jurisdiction upon application to and approval by that commission. Plaquemine v. Louisiana Public Service Comm'n, 282 So.2d 440 (La.1973); Shreveport v. Southwestern Gas & Electric Co., 151 La. 864, 92 So. 365 (1922). Gulf States cites Richmond Power & Light v. FPC, *supra,* for the proposition that this state law must be applied in determining whether or not the 1950 contract was fixed rate.

*Richmond Power & Light* is inapposite here. In that case the court looked to state law to see if the parties had intended to allow unilat-

eral rate increases because "both parties to the contract admittedly [although erroneously] assumed that the [state regulatory commission], not the Federal Power Commission, had ultimate jurisdiction over the contract." 156 U.S.App.D.C. at 323, 481 F.2d at 498. Gulf States makes no claim that the parties to its contract with SLEMCO entertained a similar misconception.

**11.** Two contracts are involved in the *Sam Rayburn* case. ⌐ne Sam Rayburn contract differs from the SLEMCO contract. The other contract, between Mid–South Electric Cooperative and Gulf States, is identical to the SLEMCO-Gulf States contract. The FPC determined that it imposed a fixed rate, and this determination was not contested.

Mid-South's claim that the "mutual course of dealing served to effect a modification of the terms of the written contract" as part of its "duty . . . to ascertain whether or not the proposed increase conflicted with any existing contractual arrangement . . . ." 169 U.S.App.D.C. at 292, 515 F.2d at 1109.

SLEMCO raises this question before us in its Intervenor's brief. However, it appears, both from SLEMCO's brief [12] and from its decision to dismiss its appeal from the June 1973 order after the Commission had entered its October and November 1973 orders, that SLEMCO feels that its interests are adequately vindicated by the FPC's ruling, on other grounds, that there is no contractual ceiling for deliveries after Aug. 1, 1973. We affirm that ruling and do not consider the SLEMCO contention based on the impact of the course of dealing—having no need to do so to sustain the FPC's order, and having no jurisdiction to pursue the argument with respect to deliveries between June 15 and July 31, 1973.

## V. THE EFFECT OF THE 1970 LETTER AGREEMENT

We turn now to the FPC's interpretation of the 1970 letter agreement. Since this turns on the language of three of the paragraphs set out in Exhibit A, attached to the agreement, we will quote these in full:

Upon reasonable advance written notice from Customer Company will provide additional capacity at the Points of Delivery specified in Article I as Customer's Normal Load Growth warrants such additions. Normal Load Growth shall mean growth in kilowatts of maximum 15-minute demands not in excess of 15% above the highest such demand established at that Point of Delivery during the preceding calendar year. Upon reasonable advance

written notice Company will provide additional capacity for growth over and above Normal Load Growth at existing Points of Delivery to the extent that, and will establish new Points of Delivery at such points where, sound engineering and economic principles would dictate the installation of such additional capacity or new Points of Delivery if all facilities required to provide service for the affected loads belonged to one supplier. (¶ A)

In addition, the Company will, when requested by Customer, provide additional capacity, over and above Normal Load Growth at an existing Point of Delivery or establish a new Point of Delivery where the facilities necessary for such additional capacity or additional Delivery Point cannot be justified under the standards of the last sentence of paragraph A; provided that Customer gives assurance of revenue necessary to justify the investment required for the facilities or makes a cash advance equal to the total cost of such facilities, or a combination of revenue assurance and cash advance. Any cash advance shall be refunded by Company at the rate of ¹⁄₁₀th of the amount of such advance each year until total refund is completed or until said facilities are, at the election of Customer, no longer utilized to provide service to Customer, whichever is sooner. The ownership of said facilities shall remain with Company. (¶ B)

Upon reasonable advance written notice to Company, Customer may abandon any Point of Delivery or may reduce the amount of capacity previously specified under this Agreement for any Point of Delivery, provided the capacity so abandoned or reduced is to be delivered from another Point of Delivery which is supplied by Company. Such abandonment or reduction in capacity shall become effective on the date specified by Customer in the no-

12. Intvr. Br. at 39.

tice, but not sooner than 12 months after the date such notice is received by Company. (¶ D)

SLEMCO argues, and the Commission found, that Gulf States' promises, in paragraphs A and B, to "provide additional capacity" when the specified criteria were met committed Gulf States to deliver actual amounts of electric power. Gulf States contends that the agreement merely commits it to supplement the physical facilities through which electricity is delivered and that it has no effect on the maximum demand specified in article III of the original contract.

The paragraphs are not free of ambiguities, and each interpretation can be supported by reference to isolated phrases. For example, Gulf States points to ¶ A's reference to "the *installation* of . . . additional capacity" (emphasis added), and to ¶ D's reference to the "abandonment" of capacity. Gulf States argues that these phrasings clearly refer to physical structures, and thus indicate that transmission facilities, rather than a flow of electricity, are contemplated. However, ¶ D talks of "reduction," as well as "abandonment," of capacity, and can thus be said to refer to a lessening of power flow. And ¶ B discusses "the facilities necessary for such additional capacity," implying that "facilities" and "capacity" are separate concepts.

Gulf States argues that the original contract draws a distinction between "capacity," which refers to the physical size or capability of specified individual delivery points, and "commitment," which refers to Gulf States' maximum obligation for all delivery points. As we have seen, this explanation does not satisfactorily account for all the terminology used in the letter agreement. Moreover, it has been raised for the first time before this court; it was not presented to the Commission in Gulf States' request for rehearing of the FPC's October order ·or at any other point.

Although the FPC did not have the occasion to respond directly to the terminology contentions now pressed by Gulf States, it did provide a reasonable and consistent interpretation of the agreement. Under the FPC's interpretation Gulf States is committed, under the specified circumstances, to supply SLEMCO both with additional facilities and delivery points, where needed, and with the corresponding deliveries of the load growth for which the facilities are to be used. Significantly, the commitment described in ¶ A is linked to SLEMCO's "Normal Load Growth," defined in terms of "kilowatts of maximum 15-minute demands." Paragraph B commits Gulf States to provide "additional capacity" above Normal Load Growth when SLEMCO gives "assurance of revenue" or "makes a cash advance equal to the total cost" or a combination of the two. Both criteria assume increased deliveries of power. The "revenue" which SLEMCO is to assure will presumably flow from additional sales of energy, and it is reasonable to project that SLEMCO would undertake the risk of cash advances only where it is assured an increased supply of electricity.

■ Although the application of the *Mobile-Sierra-Memphis* principles to a given contract is primarily a matter of law, where the decision involves the interpretation of the parties' intent as revealed in the language of a contract, it is proper to defer to the Commission's expertise if its decision is "amply supported both factually and legally." United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division, *supra*, 358 U.S. at 114, 79 S.Ct. at 201.[13] Deference is particularly appropriate where the question is the technical one of whether a contract modification is intended to eliminate the original fixed demand ceiling, so as to accommodate load growth, rather than the mixed questions of fact, law, and policy that are raised when the

13. *See also* North Atlantic Westbound Freight Ass'n v. FMC, 130 U.S.App.D.C. 122, 397 F.2d 683 (1968).

dispute is concerned with the kinds of contractual arrangements and practices that the Commission must consider in determining whether a contract as a whole is of the *Mobile-Sierra* or the *Memphis* type.[14]

We are satisfied that neither a full evidentiary hearing nor an expanded statement of the reasons underlying the Commission's conclusion is necessary to vindicate Gulf States' rights. The Commission has instituted an investigation under § 206 to determine *inter alia* whether the Gulf States—SLEMCO contract rates are so low as to adversely affect the public interest. At the stage now under review the question turned on the effect of the August 1970 document, rather than on disputed policy or factual matters.[15] Although Gulf States argued, in its application for rehearing, that the October 9, 1973, order under review was inconsistent with the Commission's June 1973 approval of increased rates for de-

liveries in excess of the 1950 contract maximum, the primary focus of Gulf States' concern in that application was the interpretation of the 1950 contract as fixed-rate, rather than the FPC's subsequent conclusion that the 1970 letter agreement removed the demand ceiling.[16] The Commission adequately responded to the issues raised by Gulf States, pointing out that the "June 14 order only addressed itself to the contract between the parties as it existed prior to the August 1 effective date of the 1970 agreement" (J.A. 51), and that, once the demand ceiling was eliminated, the *Mobile-Sierra* cases required that the rates fixed by the contract be applied across the board.

■ The Commission was not asked on reconsideration to elaborate on the basis for its interpretation that the ceiling had been eliminated. While the explanation of this conclusion in the order issued October 19th is cursory,[17] we are not per-

---

14. *Compare* Sam Rayburn Dam Electric Cooperative v. FPC *supra* (FPC must consider course of dealings between parties although practices not incorporated into contract); Landsdale v. FPC, *supra* (contract rejected for filing by FPC must be considered for *Mobile-Sierra* purposes); Richmond Power & Light v. FPC, *supra* (contract that ties interstate rates to state rates and contract that contemplates unilateral increase possible only after § 206-type hearing by state commission do not permit unlimited unilateral increases upon filing with the FPC under § 205).

In that portion of *Sam Rayburn* discussed in note 9 *supra,* the court acknowledged the deference due the decision of the Commission but felt "constrained to disagree with it," because its examination of the contract pointed "inescapably to the conclusion" that the Commission had misread the intent of the parties. 169 U.S.App.D.C. at ——, 515 F.2d at 1003. *Citing* the FPC's "well-known" "distaste for the *Mobile-Sierra* doctrine," the court found that the Commission had

" 'attempted what may charitably be termed an "end run" ' " around the doctrine by straining to transform a contract that is unmistakably of the *Sierra* variety into a *Memphis*-type agreement."

At ——, 515 F.2d at 1005, *citing* Richmond Power & Light v. FPC, *supra,* 156 U.S.App.D.C. at 320, 481 F.2d at 495. These considerations are inapplicable in the case at bar, where the FPC has presented an interpretation of the contract and agreement that we accept as reasonable.

15. Citizens for Allegan County v. FPC, 134 U.S.App.D.C. 229, 414 F.2d 1125 (1969).

16. "As reflected by the affidavit attached hereto and incorporated herein, Gulf States understood at the time of execution of the letter agreement in 1970 and at the time of its filing in 1973, that it had the right to go to the Commission to increase rates when it needed relief not only with regard to deliveries in excess of the contract maximum limit stated in the original contract but as to deliveries within the contract maximum limit also."

Gulf States' Application for Rehearing, Motion for Investigation, Hearing and Extraordinary Relief, and Motion for Clarification of Order, in Docket No. E–8121, Oct. 24, 1973, J.A. 29, 32.

17. "At issue was [SLEMCO's] contention, in its July 13, 1973, application for rehearing, that this Agreement extends the term of [SLEMCO's] contract with Gulf States . . . at the rates and charges contained in the contract and eliminates the contract demand ceiling . . . .

. . . . .

Our review of the Agreement indicates that it does extend [SLEMCO's] contract . . . . and does remove the limitations as to demand in the contract."
J.A. 27–28.

suaded that the Commission should be required to make a detailed semantic exegesis of the kind developed by petitioner. In the context of the proceedings as a whole, "the agency's path may reasonably be discerned,"[18] sufficiently to satisfy the requirement that it have "genuinely engaged in reasoned decision-making."[19]

*Affirmed.*

TAMM, Circuit Judge (concurring in the result).

I concur in parts I–III of the majority opinion and in the result. The significant issue in this case is whether the Federal Power Commission was arbitrary and capricious in failing to explain why the 1970 letter agreement between Gulf States and Slemco eliminated the 8,000 kilowatt ceiling on the original contract. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). The effect of the Commission's action was to extend the fixed-rate characterization of the original contract to the delivery of approximately 100,000 kilowatts of electricity. *See* part III of the majority opinion. As the majority correctly observes, the Commission's explanation was "cursory." In fact, the order itself does not provide us with any guideposts from which we might discern the agency's reasoning.

Nevertheless, I am convinced from a reading of the letter agreement that were we to remand this case to the FPC for a further exposition and enlargement of its reasoning, the ultimate result would be identical with that reached by the present opinion. Thus, the need for finality and for the elimination of marginal questions from crowded agency dockets outweighs any benefits to be gained by a remand, especially since the Commission's conclusion appears to be fa-

cially correct. Although the court does not customarily assume a favorable supplementary record, the facts before us are such that we should do so.

Accordingly, I concur in the result reached by the majority opinion.

18. Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851, *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

