NEW ENGLAND POWER COMPANY,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Central Maine Power Company,
Intervenor.

No. 75–1945.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 7, 1976.
Decided Dec. 21, 1977.

**1214**

George F. Bruder, Washington, D. C., for petitioner.

Philip R. Telleen, Atty., Federal Power Commission, Washington, D. C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel and Allan Abbot Tuttle, Sol., Federal Power Commission, Washington, D. C., were on the brief, for respondent.

Ronald D. Jones and Philip Palmer McGuigan, New York City, were on the brief, for the intervenor.

Before BAZELON, Chief Judge, and LEVENTHAL and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case arises out of a dispute among the New England utilities which built and own the Maine Yankee nuclear power plant over the allocation of transmission costs among them. Unable to agree on the financial arrangements, Central Maine Power Co. (Central Maine) unilaterally filed with the Federal Power Commission (FPC) a rate modification relieving itself of the obligation to make certain payments. The FPC found that the resulting rates were not unreasonable, a ruling not challenged here. The New England Power Co. (NEPCO) claims that the filing, even if reasonable, was a unilateral filing not permitted under the utilities' Transmission Agreement, and hence impermissible under *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division,* 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958). The FPC rejected NEPCO's position. We affirm the FPC ruling as a reasonable contract interpretation, consistent with the record of the negotiations leading to the Transmission Agreement.

## I. BACKGROUND

In 1966, eleven New England utilities ("sponsors") agreed to build and operate the Maine Yankee nuclear generating plant in Wiscasset, Maine. The three Maine sponsors use about half of the power from Maine Yankee. To secure the participation of the non-Maine sponsors in the joint venture, the Maine utilities apparently agreed in principle to bear the costs of transmitting the power to the Maine-New Hampshire border to permit further transmission to the southern New England power grid. The exact terms were left to be worked out later.

The Transmission Agreement was signed by the twelve transmitting utilities on April 1, 1971. It was negotiated under the pressure of a deadline established by the SEC in the settlement of an antitrust claim by municipal utilities.[1] The provisions critical for this case are in sections 4, 5, and 10, excerpted in the appendix. The municipals were allowed to purchase some of the Maine Yankee power, and to become parties to the agreement by executing a supplement. To complete the settlement, a provision for allocating transmission costs, acceptable to the municipals, had to be worked out. Section 4 of the Transmission Agreement ("Payment for Transmission

---

1. *See Municipal Electric Association of Massachusetts v. SEC,* 134 U.S.App.D.C. 145, 413 F.2d 1052 (1969).

Services Received") provided that the parties pay into a fund the percentage of transmission costs equal to the percentage of Maine Yankee's power that they take, an allocation technique known as the "postage stamp" method.[2] The fund is then distributed to the utilities providing the transmission services in reimbursement of the costs of transmission. In place of its obligation to provide the transmission facilities to the New Hampshire border, Central Maine agreed to pay into the fund for the power it took, even though it did not receive transmission services from any other utility, since Maine Yankee is located within its service area.[3]

Subsequent to the original undertaking, it turned out that Central Maine had to build two 345 kilovolt transmission lines rather than the single line originally anticipated. Central Maine sought financial support for this extra undertaking from the other utilities. At various times, most of them responded favorably to Central Maine's position. However, at the time of completion of the Transmission Agreement, no arrangement for financial relief of Central Maine had been agreed upon.

Since the matter could not be settled in the hectic negotiations carried out to produce the purchase and transmission agreements to meet the SEC settlement deadline, Central Maine proposed that each transmitting party be allowed to file modified rates with the FPC, unilaterally, subject to acceptance by the FPC. Being on notice that Central Maine intended to use the right to file a modified rate structure as a "final last straw"[4] in its efforts to obtain transmission support, petitioner New England Power Co. (NEPCO), sought to require unanimous action by the transmitting parties to file modified rates with the FPC. NEPCO failed in this. The disputed § 10 of the Transmission Agreement permits unilateral filing, restricted however by a parenthetical provision which is the focus of this case. Section 10 provides in pertinent part:

> Each transmitting party reserves the right to submit for filing without the concurrence of any other party a New England power pool agreement and from time to time other rate schedules (*with an annual rate determined in accordance with the method set forth in Section 4 hereof*) modifying or superseding this Agreement and each party reserves the right to object to any such New England power pool agreement and other rate schedules in accordance with Federal Power Commission rules and regulations.

R. 392–93 (emphasis added).

Unable to reach agreement on relief from its transmission costs, Central Maine unilaterally filed a modification of the rate schedule on February 14, 1973, shortly after Maine Yankee began commercial operation.[5] The modification amended § 4 of the

---

**2.** This name derives from the fact that all users pay the average unit transmission cost, regardless of the distance the user is from the source.

**3.** There is an apparent ambiguity in the obligation under the Transmission Agreement, at least in looking at the heading of the pay-in section, § 4, entitled "Payment for Transmission Services Received." Arguably Central Maine is not covered by the section because it does not receive any transmission service. However, headings are not controlling over the text. Central Maine concedes that under the Agreement as signed, it was required to pay the postage stamp transmission costs on the power it used. Record at 180 [hereinafter cited as R. ____].

**4.** "The method that would be taken to remedy through Section 10 was never discussed. It was only that the provisions of Section 10 would be used as a final last straw, if necessary." Testimony of Elwin W. Thurlow, President of Central Maine at hearings before Presiding Administrative Law Judge (ALJ) Freibourg on Aug. 23, 1973, R. 182–83.

**5.** Central Maine's President testified that all the Maine Yankee sponsors except NEPCO had indicated that "they would go along with some form of reasonable support arrangements. . . ." R. 38E–38F. NEPCO and four other sponsors moved the FPC to reject Central Maine's proposed modification. Only NEPCO pursues this appeal of the FPC's acceptance of the modification. Significantly, Public Service Co. of New Hampshire, which loses the most by the modification, intervened on March 8, 1973, in favor of Central Maine's filing, stating:

> Petitioner has informed Central Maine that Petitioner believes Central Maine is entitled

Transmission Agreement to require payments only from utilities receiving transmission service from others. This had the sole effect of removing Central Maine's obligation to pay into the pooled transmission account. On April 10, 1973, the FPC accepted Central Maine's proposed modification to be effective thirty days after its filing and instituted an investigation into the lawfulness of the modification pursuant to § 206(a) of the Federal Power Act, 16 U.S.C. § 824e(a). Hearings were held before the Presiding Administrative Law Judge (ALJ) on August 22–24, 1973. In his initial decision of September 3, 1974, the ALJ found that the proposed modification was not contractually barred and that the resulting rates were not unjust or unreasonable. Exceptions were taken to this decision by NEPCO and four other parties to the Transmission Agreement. On July 3, 1975, the FPC issued an order affirming the ALJ's initial decision and on August 25, 1975 an order denying NEPCO's motion for rehearing.[6]

NEPCO alone appeals the FPC's decision. The appeal is solely on the basis that the unilateral filing is not permitted under the *Sierra-Mobile-Memphis* doctrine.[7]

The modification relieves Central Maine of payments of about $1.2 million annually. Central Maine maintained that the annual carrying charges for the two 345 kilovolt transmission lines is about $3.8 million, so that it has recouped less than half of its transmission costs by the modification.[8] Furthermore, Central Maine testified to its intent to withdraw the modification in 1986, by which time it projects that its load will have increased to the point that "two lines would have been necessary for the use of the Central Maine system alone and that they would have been built by then regardless of Maine Yankee."[9] The modification must be taken as just and reasonable in amount. The only question is whether it is permissible under the *Sierra-Mobile-Memphis* doctrine.

## II.  LEGALITY OF THE FILING

### A.  *The Sierra-Mobile-Memphis Doctrine*

█ By this time the standard governing permission to file unilateral rate changes is well settled.[10] In companion cases, *Mobile-Sierra*,[11] the Supreme Court prohibited revision of contractual rates by the FPC merely on a finding that the new rate was not unreasonable, without affecting the FPC's power to revise rates when "necessary in the public interest."[12] Two years later, the Court rounded out this doctrine that the contract governs the normal course of affairs in *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division*.[13]

---

to compensation for transmitting Maine Yankee power and that the requested modification would, in Petitioner's opinion, be a reasonable means of providing Central Maine with such compensation. R. 831.

**6.** These orders, R. 1043 and R. 1063, respectively, were in Dockets No. E–7824 (the uncontested filing of the Transmission Agreement on Nov. 13, 1972) and No. E–8038 (Central Maine's unilateral filing of Feb. 14, 1973).

**7.** *See* section II A, *infra*.

**8.** [Central Maine] concludes that the modification is just and reasonable both because the revenues it receives are similar to those received by the other companies under the Agreement and also because these revenues only cover 47% [*sic*] of the carrying charges of the two 345 Kv lines.[6]

[6] Annual carrying charges are allegedly $3,835,000 while [Central Maine] receives under the modified rates $1,175,000. FPC Order Affirming Initial Decision, *supra* note 6, at 8–9, R. 1050–51.

**9.** ALJ Initial Decision at 8, R. 928.

**10.** *See Appalachian Power Co. v. FPC,* 174 U.S. App.D.C. 100, 102–04, 529 F.2d 342, 344–46 (1976), *cert. denied,* 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976).

**11.** *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 343, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 353, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

**12.** Federal Power Act § 201(a), 16 U.S.C. § 824a(a).

**13.** 358 U.S. 103, 109–13, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958).

The important and indeed decisive difference between this case and *Mobile* is that in *Mobile* one party to a contract was asserting that the National Gas Act somehow gave it the right unilaterally to abrogate its contractual undertaking, whereas here petitioner seeks simply to assert, in accordance with the procedures specified by the Act, rights expressly reserved to it by contract.[14]

As we have summarized it;

[t]he rule of *Sierra, Mobile* and *Memphis* is refreshingly simple: The contract between the parties governs the legality of the filing. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid.[15]

B. *Scope of the Memphis Clause*

Section 10 of the Transmission Agreement is a so-called *Memphis* clause, inserted so as to permit rate filings that are unilateral in the sense of not requiring the concurrence of purchasers.

The only dispute presented to us is whether the parenthetical condition on any unilaterally proposed modified rate, "with an annual rate determined in accordance with the method set forth in Section 4 hereof," bars the filing made by Central Maine.

NEPCO and Central Maine agree that a central purpose, if not the sole purpose, of the parenthetical clause was to assure the municipal utilities, who were the beneficiaries of the SEC settlement which created the

deadline for the Transmission Agreement negotiations, that there would be no abandonment of the "postage stamp" method of charging for transmission service.[16] A possible, and probably the simplest, interpretation of the parenthetical is that the "method" which is to be preserved is the "postage stamp" method. NEPCO argues that the "method" refers to the entire pay-in provision of § 4, under which it is conceded that Central Maine was obligated to pay for transmission services it did not receive. Under this interpretation, Central Maine, which insisted on the § 10 *Memphis* clause as a "last straw" means to enable it to obtain financial relief from its transmission costs, relief that the co-ventures would not then provide, gave up, in the same section, any possibility of reducing its payments under the Transmission Agreement.[17]

The testimony of the NEPCO and Central Maine representatives at the negotiations fairly demonstrates that NEPCO did not win such a complete victory in the provisions of the Transmission Agreement. What emerges is that the parties almost deliberately refrained from resolving the ambiguity set out above. Given the pressure to reach an agreement for the antitrust settlement and their inability to agree on transmission support for Central Maine, the parties in effect papered over their differences. There was still hope for settling the underlying support problem. If not, the matter was left for resolution by an outside tribunal—the FPC in its treatment of any unilateral filing or a court in litiga-

14. *Id.* at 112, 79 S.Ct. at 199.

15. *Richmond Power & Light v. FPC,* 156 U.S. App.D.C. 315, 318, 481 F.2d 490, 493, *cert. denied* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 472 (1973).

16. *See* note 2, *supra.* Donald G. Allen, NEPCO's vice president and negotiator of the Transmission Agreement testified:

A principal purpose for this clause was to assure the "accepting offerees" under the settlement offer that the postage stamp approach would be preserved and that they could count on a uniform transmission charge from Maine Uankee [*sic*] Power which was insensitive to distance.
R. 231.

17. NEPCO was asked at argument what changes Central Maine *could* unilaterally file under its interpretation of the *Memphis* clause. NEPCO replied that modification of § 5 governing the pay-out of the pooled transmission account (see section D, *infra*) e. g., "we want twice as much," would be permitted. Obviously, NEPCO has to suggest some interpretation whereby the permissive effect of § 10 is not wiped out by the parenthetical clause. However, since decreasing the pay-in is functionally equivalent, so far as mathematics is concerned, to increasing the pay-out, we do not perceive that it has done so.

tion. After losing its attempt to prevent unilateral filings altogether and getting the parenthetical as a "consolation prize," NEPCO did not imagine at the time of making the Transmission Agreement that it had won an absolute veto and that the interpretation it now presents had been adopted. Mr. Allen, NEPCO's representative at the negotiations, testified:

Obviously representing NEPCO I had a very difficult decision to make at the time. We had a deadline to meet, it was vital to all of us that it be met, and Mr. Thurlow has indicated the pressure on all of us. I had made my request that unilateral changes in the transmission agreement be made jointly by all transmitting parties, and had been told that this was not so—was not acceptable.

Contrary to Mr. Thurlow's recollection, it is my recollection, though not a clear one, that the parenthetical expression which limits unilateral changes to things which do not change the formula in Section 4, was the brilliant inspiration of somebody else, and as I indicate here was thought to be desirable to assure the municipal officers, who might come in, that they would not have a change in formula in determining them.

It is my recollection that *I was offered a consolation prize, which I considered, that maybe this did me some good.* I think it did. And I think the balance of my willingness to go forward on Section 10 as the best we could arrange it really was based on an overall consideration as I outlined in answer to Mr. Jones' question. I think there are very difficult questions involved in parsing out Section 10, it covers a multitude of different events, including the advent of NEPOOL, the advent of NEPOOL with some purchasers joining, others not, some transmitters joining, others not. A whole range of possibilities where there might be a superseding rate schedule or modification proposed.

Ultimately I was willing to go ahead on the basis *this was the best I could do for New England Power Company,* in the face of a reasonably clear intent on Central Maine to do something, because I felt as I have expressed it, that the ultimate test of whether this is consistent with the business understanding, the contract, and the *ambiguous concent [sic] to unilateral filings* would have to be decided if we could not decide it otherwise before an arbitration board or before the FPC.[18]

### C. *Deference to the FPC's Interpretation*

In deciding the *Sierra-Mobile-Memphis* issue, the FPC did not rely, as had the ALJ's initial decision, on the existence of an ambiguity in the Transmission Agreement concerning Central Maine's obligation to pay in under § 4. The FPC noted:

we point out that the emphasis in the initial decision upon resolution of ambiguity in Section 4 of the Agreement is misplaced for such ambiguity is immaterial to the *Sierra-Mobile* issue and in any event [Central Maine] fully understood its Section 4 pay-in obligation.[19]

The FPC considered the history of the negotiations leading up to the Transmission Agreement and concluded:

[T]he history of the Agreement . . . suggests that [Central Maine] viewed Section 10 as providing a means to terminate its Section 4 pay-in obligation if subsequently it could not obtain a support agreement from the other members of the Maine Yankee, in particular NEPCO, while NEPCO viewed the parenthetical clause of Section 10 as assuring [Central Maine's] continued pay-in obligation. The record does not provide a picture of negotiations in which there was a clear consensus among the parties. [Central Maine] had been seeking some support agreement ever since it realized that two lines were necessary instead of just one. In like manner NEPCO has fought support for these lines from the beginning. Furthermore, the exigent atmosphere

---

**18.** Testimony on Aug. 23, 1973, R. 271–72 (emphasis added).

**19.** FPC Order Affirming Initial Decision, *supra* note 6, at 6, R. 1048. *See* note 3, *supra.*

surrounding the 1971 execution of the Agreement added to the inability to fully resolve these problems.[20]

Based on the "plain meaning" of the word "method" in the parenthetical clause and the crucial role of the "postage stamp" method in the antitrust settlement, the FPC interpreted the parenthetical clause as preserving the "postage stamp" method only.[21] This led to the conclusion that Central Maine's filing was permissible, subject of course to FPC review of reasonableness.

In past cases, we have identified the FPC's hostility to the *Sierra-Mobile* doctrine.[22] In the present case, the FPC's handling of the contract interpretation issue is not unprincipled, or reflective of a determination to find an ambiguity where there is none. Our examination of the record confirms the finding that the parties did not reach agreement on the allowable extent of the right of unilateral filing.* As we have noted, they papered over their differences, leaving resolution of the ambiguity, in the event of failure to reach a settlement, to some future tribunal.

Our recent decisions in this area reflect a deference to the FPC, albeit a limited one, in *Sierra-Mobile-Memphis* contract interpretation matters. In this case, we find that the FPC's "decision is 'amply supported both factually and legally.' "[23]

**20.** *Id.* at 7, R. 1049.

**21.** *Id.*

**22.** The FPC's distaste for the *Mobile-Sierra* doctrine is well known, and it has been in the past necessary for this court to remind the FPC that it is not free to ignore the doctrine. Here, as in past cases, the FPC has "attempted what may charitably be termed an 'end run' " around the doctrine by straining to transform a contract that is unmistakably of the *Sierra* variety into a *Memphis*-type agreement.
*Sam Rayburn Dam Electric Cooperative v. FPC,* 169 U.S.App.D.C. 281, 288, 515 F.2d 998, 1005 (1975) *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976) (citations omitted).

* Having awaited with some anticipation and curiosity the reasons for the dissenting vote, it is fair to record a sense of letdown and bafflement that the dissenting opinion stresses the sentence to which this footnote is appended. Clearly, the parties did not reach agreement on the allowable extent of changes in filings. But they *did* reach agreement that the rates were not frozen, and that there was latitude to change. They *did* reach agreement that unanimity was not necessary. The contract does expressly provide for the unilateral filing of a rate modification, so it satisfies the *Memphis* part of the *Mobile-Sierra-Memphis* doctrine.
This is not a case where a party gave consent to any change that the other unilaterally imposed. Even in ordinary contract law, where there is no tribunal other than a court to resolve differences, there is enough "give" in doctrines of interpretation to permit the court to construe the "reasonable" intention of the parties. But we need not ponder such matters, for here the parties contracted in the context of an agency with expertise, the Federal Power Commission, with jurisdiction and equipment to monitor any complaints that the changes made were not reasonable. And so, in giving up the requirement of its consent, NEPCO was not surrendering to the mercies of Central Maine, it was retaining the power to complain to the FPC. In making such a complaint, NEPCO could not be confronted with the response that it had already agreed that the particular change was reasonable. Thus, NEPCO retained the ability to continue its fight if it resented the particular change. But the FPC's ruling that the particular change is reasonable was not appealed to this court. What NEPCO contends on appeal is that there could be no change without its consent. This is another way of saying that the contract rates were frozen, for even a rigid contract can be changed if everyone consents. NEPCO's response was frozen, or at least obdurate, but the contract was not congealed.

**23.** Although the application of the *Mobile-Sierra-Memphis* principles to a given contract is primarily a matter of law, where the decision involves the interpretation of the parties' intent as revealed in the language of a contract, it is proper to defer to the Commission's expertise if its decision is "amply supported both factually and legally."
*Gulf States Utilities Co. v. FPC,* 171 U.S.App.D.C. 57, 64, 518 F.2d 450, 457 (1975). *Appalachian Power Co. v. FPC,* 174 U.S.App.D.C. 100, 109. 529 F.2d 342, 351, *cert. denied,* 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976). *See also Columbia Gas Transmission Corp. v. FPC,* 174 U.S.App.D.C. 204, 207, 530 F.2d 1056, 1059 (1976); *Indiana & Michigan Electric Co. v. FPC,* 174 U.S.App.D.C. 208, 210, 530 F.2d 1060, 1062 (1976); *North Atlantic Westbound Freight Assn. v. FMC,* 130 U.S.App.D.C. 122, .124, 397 F.2d 683, 685 (1968); *Western Union Telegraph Co. v. FCC,* 541 F.2d 346, 351 (3d Cir. 1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977).

### D. Arbitration Claim

Alternatively, NEPCO argues that Central Maine's filing is prohibited for its failure to comply with § 5 of the Transmission Agreement, "Payment for Transmission Services Rendered." The first paragraph of § 5 prescribes how the pooled transmission account created by the pay-in provisions of § 4 is to be divided among the utilities providing transmission services. The second paragraph provides:

> If a substantial change in conditions occurs the foregoing method of determining the division of transmission payments and the method of determining such payments shall be subject to review and redetermination at the request of any transmitting party. If the transmitting parties are unable to agree as to what constitutes an equitable redetermination the matter shall be subject to arbitration as hereinafter provided.

NEPCO maintains that "the method of determining such payments" refers to the pay-in formula of § 4, and that hence Central Maine was required to show a "substantial change in circumstances" and comply with the arbitration provision before modifying its pay-in obligations under § 4.

■ The Transmission Agreement relates to two kinds of payments: the payments-in of § 4 and the payments-out of § 5. The

FPC rejected NEPCO's contention that "the method of determining such payments" in § 5 refers to the § 4 formula for determining payments in. Rather, the Commission determined that this phrase refers to administrative details associated with payments out.[24] The Commission's reading is reasonable and we accept it.

### E. Structure of Unilateral Filing

In one aspect, the FPC's disposition of the arbitration claim, which we have just approved, does not fully face up to the complexities of this case. In effect, the FPC says that the arbitration clause only applies to controversies under the Agreement over receipts for transmission services rendered (§ 5) whereas here the issue concerns the meaning of § 4, relating to payments for transmission services received.

■ A conundrum of sorts arises from the circumstance that this controversy is lodged within the jurisdiction of the FPC as a change in rates for payments received for services rendered. We refer to the structure of the Act[25] and the structure of the FPC's implementing regulations.[26] These sections, following the general pattern of public utility law and practice, provide that a utility transmitting and selling energy shall file its rates, subject to FPC inquiry,

---

**24.** "Finally, the arbitration provision in Section 5 is not controlling here. The arbitration clause refers to both 'the foregoing method of determining the division of transmission payments' and 'the method of determining such payments.' Although an argument can be made for reading this latter 'method' to refer to the Section 4 method of payment for transmission services received, its context in the Agreement suggests a contrary interpretation. Section 5 is entitled 'Payment for Transmission Services Rendered', as contrasted to Section 4, which is 'Payment for Transmission Services Received'. 'Payment' therefore has two meanings: payment into the transmission fund by those receiving wheeling service versus payment from the fund as compensation for providing wheeling services. 'Method of determining such payments' refers to the administrative details set out in Section 5 for actual payment of wheeling revenues, apart from the 'method of determining the division of transmission payments.'"

FPC Order Denying Rehearing, *supra* note 6, at 4, R. 1066.

**25.** All rates and charges made, demanded, or received by any public utility . . .

Federal Power Act § 205(a), 16 U.S.C. § 824d(a).

Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility . . .

Federal Power Act § 206(a), 16 U.S.C. § 824e(a).

**26.** Every public utility shall file with the Commission . . . full and complete rate schedules, as defined in § 35(b), clearly and specifically setting forth all rates and charges for any transmission or sale of electric energy. . . .

18 C.F.R. § 35.1(a) (1976).

and increase its rates only by filing amendments to its schedules with opportunity for the FPC to determine the validity of the increased rates it proposes to receive for its sale or transmission service. Here Central Maine's filing turns on the proper interpretation of its contract obligation to *make payments*. Generally under public utility law and practice the inquiry concerns receipts of a transmitting utility and not payments by the utility.

However, none of the parties has raised a jurisdictional question. It is desirable that the pricing obligations between buyers and sellers of electric energy and transmission service should be definite. The matter might be recast in terms of FPC authority to issue a declaratory judgment at the instance of a buyer as to the price he is obligated to pay. In any event, under this agreement Central Maine is receiving a price for its service in transmitting energy to the Massachusetts border which is calculated by determining the amount it is entitled to receive under § 5 of the agreement and deducting, as an offset, the amount it is required to pay under § 4. When an agreement is structured as this one is, Central Maine can in effect increase the rate it receives for that transmitting service by reducing the offset it has to pay under § 4. We are satisfied that it was appropriate for the FPC to determine the controversy. And since we are satisfied with the determination it has made, the FPC's orders are

*Affirmed.*

MacKINNON, Circuit Judge, dissenting:

I do not agree that the contractual provision at issue in this case permitted the unilateral modification undertaken by Central Maine. Nor do I agree that this contract meets the requirements of the *Mobile-Sierra-Memphis* trilogy. These conclusions are reached because in my view the provision of the contract permitting the filing of a "rate schedule . . . *with* an annual rate . . ." does not authorize filing a rate schedule that dispenses entirely with the payment of *any* rate by those utilities who use 50% of Maine Yankee's electricity. Nor, in my opinion, is that provision of the contract which, as the majority states, "relates to two kinds of payments: the payments-in of § 4 and the payments-out of § 5" (at ―― of 187 U.S.App.D.C., at 1220 of 571 F.2d) properly interpreted when its reference to "such payments" is construed to refer, not to any form of "payment" but to "administrative details." Administrative details are *not* a method of payment. Hence, I am prompted to a different conclusion than that reached by the majority.*

## I. APPLICATION OF THE *MOBILE–SIERRA–MEMPHIS* TRILOGY

In my opinion, the decision of the Commission should be vacated in its entirety, first, for failure to comply with the *Mobile-Sierra-Memphis* trilogy.[1] This reason is sufficient by itself to justify such result. In applying the principles contained within that trilogy, the most important statement in the majority's opinion is the candid admission that "[o]ur examination of the record confirms the finding that the parties did not reach agreement on the allowable *extent* of the right of unilateral filing." (At ――, at 1219 of 571 F.2d, emphasis added). This is equivalent to saying that there was *no* contract between the parties concerning the extent to which unilateral filing would be permitted. With this finding, I am in complete agreement.[2] It de-

* Throughout this opinion, unless otherwise indicated, emphasis has been added to quoted matter which appears in italics.

1. *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *United Gas Pipe Line Co. v. Memphis Light, Gas and Water*

*Division*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958).

2. While concluding that "no agreement" had been reached, the majority opinion emphasizes the arguments supporting Central Maine Power Co.'s construction of the ambiguous section 10. It is useful to note the opposing arguments that support New England's construction.

stroys the conclusion of the majority that the contract authorized the instant filing, because the filing that was made cannot be said to comply with any conditions with which the parties can be said to have agreed.

In *United Gas Co. v. Memphis Gas Division*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958), the Supreme Court permitted a natural gas pipeline company to increase its rates, whereas in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), the natural gas company was prohibited from doing so. The Supreme Court explained the different result in these words:

> The important and indeed decisive difference between this case and *Mobile* is that in *Mobile* one party to a contract was asserting that the Natural Gas Act somehow gave it the right unilaterally to abrogate its contractual undertaking, whereas here petitioner seeks simply to assert, in accordance with the procedures specified in the Act, rights *expressly reserved to it by contract.*

358 U.S. at 112, 79 S.Ct. at 199. The contract in *Memphis* expressly provided that "all gas delivered hereunder shall be paid for by Buyer under Seller's rate schedule . . . or any effective superseding rate schedules, on file with the Federal Power Commission." 358 U.S. at 105, 79 S.Ct. at 196. An *express* mutual understanding,

such as that found in *Memphis*, where the extent of the permitted filing was the subject of a specific agreement clearly authorizing "*any* effective superseding rate [schedule]," is missing here. As found by the FPC, the bargaining "history" suggested that the two parties in writing the contract had completely contradictory views as to the permissible filings (App. 1049). While section 10 permits unilateral filing of other rate schedules with an annual rate determined in accordance with the section 4 method, at the bottom line, there is no agreement that *explicitly* permits the Central Maine Power Company wholly *to exempt* itself from delivery charges and thereby *to raise* the charges to all other users *unilaterally.* As is more fully developed below, that action is inconsistent with the controlling provisions of the contract and the intent evident throughout the negotiations over the relevant provisions of the contract.

Since admittedly there was no explicit contractual agreement on the extent of the right of unilateral filing, Central Maine was prohibited from unilaterally increasing its rates by *Mobile, supra,* and *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). If the power suppliers wish to adjust rates unilaterally in the manner here sought, they must obtain the definite contractual assent of the other parties to the contract.[3] Central Maine did

---

Some protection for power customers must have been intended by the provision that "the method set forth in Section 4" be maintained. It affords very little comfort to have a postage stamp rate, however, if everyone else is free to opt out of the service pool. Preserving the "method" of section 4 must, at a minimum, require that the parties liable for payment of service charges not be allowed to exempt themselves. What freedom, then, does section 10 afford? An important advantage is the ability to raise *everyone's* postage stamp rate. That was precisely the type of authority granted in *United Gas Co. v. Memphis Light, Gas and Water Div.*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958), from which the phrase "*Memphis* clause" is derived. That ability would be critical to Central Maine Power Co. in the event of rising distribution costs, to guarantee that all parties, not just Central Maine Power Co., pay their fair share. That power could

well have been the "final last straw, if necessary" which Central Maine's President claimed to have obtained from the negotiations, and upon which the majority opinion places such stress. *See. e. g.*, at —— of 187 U.S.App.D.C. n. 4, at 1215 of 571 F.2d n. 4. However, as pointed out by New England in its Application for Rehearing, the parenthetical clause was intended to protect the postage stamp rate and as a *quid pro quo* to New England for abandoning its opposition to unilateral amendment (App. 1056).

3. Another route may also be open to Central Maine, even now, so that no serious hardship will result from not permitting a unilateral change in the delivery charges. If the effect on Central Maine is unreasonable and contrary to the public interest, it might petition the FPC to adjust the charges to prevent an "unreasonable" result. The Supreme Court suggested this alternative route in *Mobile*:

not obtain that assent here. The reasons are numerous, but they are immaterial. The fact is that the parties did not reach any agreement on the type of filing here attempted that satisfies the *Memphis* part of the *Mobile-Sierra-Memphis* doctrine. The majority opinion, in effect, admits this.[4]

The parties to the present dispute *could* have contracted to allow Central Maine to seek such modifications unilaterally, but they did not do so. The majority opinion states, they "papered over their differences, leaving resolution of the ambiguity . . . to some future tribunal" (at —— —— of 187 U.S.App.D.C., at 1219 of 571 F.2d). Whether or not this is a fair characterization of the language they used, I do not agree that a judicial tribunal thereby acquired power to write a binding contract for the parties that permits the kind of unilateral action which is the subject of this controversy. The Transmission Agreement prescribed a standard with which all transmitting parties, including Central Maine,[5] were required to comply. It is not the province of this court to write a new contract provision for the parties that would allow one of them to file a "rate schedule" that was not "determined in accordance with the method set forth in Section 4 [of the Transmission Agreement]."[6]

My dissent is thus cast against the illogic of the majority that proceeds from an admission of no explicit contractual agreement to the conclusion that the parties agreed to unilateral changes in the rate schedules that would eliminate the Maine utilities completely from their contractual obligation to pay the "postage stamp rate." The Supreme Court has ruled that "the Natural Gas Act does not empower natural gas companies unilaterally to change their contracts."[7] To my mind that determines the outcome here. I find grounds to reverse solely on the failure of the Commission to comply with the *Mobile-Sierra-Memphis* trilogy.

## II. THE CONSTRUCTION OF SECTION 5 OF THE TRANSMISSION AGREEMENT

*A. Testing the FPC Interpretation*—A second point that would uphold the contentions of New England relates to the interpretation of sections 4 and 5 of the Transmission Agreement. Section 4 is entitled *"Payment for Transmission Services Received,"* and section 5 is entitled *"Payment*

---

It may be noted also that this interpretation, while precluding natural gas companies from unilaterally changing their contracts simply because it is in their private interests to do so, does not deprive them of an avenue of relief when their interests coincide with the public interest. Section 5(a) authorizes the Commission to investigate rates not only "upon complaint of any State, municipality, State commission, or gas distributing company" but also "upon its own motion." Thus, while natural gas companies are understandably not given the same explicit standing to complain of their own contracts as are those who represent the public interest or those who might be discriminated against, there is nothing to prevent them from furnishing to the Commission any relevant information and requesting it to initiate an investigation on its own motion. And if the Commission, after hearing, determines the contract rate to be so low as to conflict with the public interest, it may under § 5(a) authorize the natural gas company to file a schedule increasing the rate.

350 U.S. at 344–45, 76 S.Ct. at 381 (footnote omitted) (reference to § 5(a) relates to 15 U.S.C. § 717d(a) (1970)). New England in its

petition for rehearing refers to the possibility of a remedy for the Maine companies if they can meet the public interest requirements of § 206 of the Act (App. 1059).

4. I do not read the majority opinion to attempt the argument that the parties expressly contracted that the meaning of an ambiguous section 10 was to be resolved by the Federal Power Commission. There is nothing in the record to support such a strained interpretation. And if such an agreement had been reached, it would not constitute the type of "right expressly reserved to [the supplier] by contract" that was found sufficient in *Memphis* to overcome the rule against unilateral rate changes.

5. Preambulatory language of the Transmission Agreement refers to Central Maine as a "transmitting party." App. 389.

6. *See* discussion *infra* at —— —— —— of 187 U.S. App.D.C., at 1223–1227 of 571 F.2d.

7. *United Gas Pipe Line Co. v. Mobile Gas Service Corp., supra*, 350 U.S. at 344, 76 S.Ct. at 380.

*for Transmission Services Rendered."* Each section deals with the subject of its title, but the very first sentence of section 5 *also* refers to payments made by purchasing utilities *under section 4*, and later sets forth the following provision on arbitration:

> If a substantial change in conditions occurs the foregoing method of determining the division of transmission payments and the method of determining *such payments* shall be subject to review and redetermination at the request of any transmitting party. *If the transmitting parties are unable to agree as to what constitutes an equitable redetermination the matter shall be subject to arbitration as hereinafter provided* [in section 7].[8]

Section 5 of the Maine Yankee Transmission Agreement of April 1, 1971 (emphasis added).

New England contends that the *"method of determining such payments"* (emphasis added) refers to the method for determining payments for "transmission services received," as prescribed by section 4, and that in the circumstances here present (where the parties have not agreed upon an equitable redetermination), the change proposed

by Central Maine could not be imposed without first submitting the matter to arbitration as provided in the contract. Central Maine, however, contends that *"such payments"* "only involves payments to transmitting parties . . ." (Central Maine Brief at 26). In support of this construction, it cites a passage in the FPC opinion which states that the

> [m]ethod of determining such payments [did *not* refer to the method of determining transmission payments but] "refers to the *administrative details* set out in Section 5 for actual payment of wheeling revenues, apart from the" method of determining the division of transmission payments.[9]

FPC Order Denying Rehearing at 4 (App. 1066). The validity of this interpretation can easily be tested by replacing "such payments" in the questioned sentence of section 5 with the language of the FPC's interpretation as relied upon by the majority (at —— of 187 U.S.App.D.C., at 1220 of 571 F.2d). The sentence in question would then read as follows:

> If a substantial change in conditions occurs the foregoing method of determining

**8.** Section 7 of the Transmission Agreement provides:

> 7. *Arbitration*
>
> Any dispute as to the interpretation or performance of this Agreement which cannot be settled by mutual agreement shall be submitted to arbitration in accordance with the Federal Arbitration Act (U.S. Code, title 9) and the rules of the American Arbitration Association. All parties to this Agreement shall be entitled to notice of, and to participate in, such arbitration. The parties shall, if possible, agree upon a single arbitrator or a panel of three arbitrators. In case of failure to agree on an arbitrator or arbitrators within 21 days after written notice by one party to the other parties that an arbitrable dispute exists hereunder, any party may request the American Arbitration Association to appoint a panel of three arbitrators, one or more of whom shall be persons skilled in matters relating to the transmission of electricity. The arbitrator or arbitrators, after opportunity for each of the parties to be heard, having defined the matter or matters in dispute, shall consider and decide the same and notify the parties in writing of his or their decision. Such decision shall be binding upon the par-

ties, and the expenses of the arbitration shall be borne equally by the participating parties. (App. 392).

**9.** The full statement in the FPC opinion states:

> Finally, the arbitration provision in Section 5 is not controlling here. The arbitration clause refers to both "the foregoing method of determining the division of transmission payments" and "the method of determining such payments." Although an argument can be made for reading this latter "method" to refer to the Section 4 method of payment for transmission services received, its context in the Agreement suggest a contrary interpretation. Section 5 is entitled "Payment for Transmission Services Rendered", as contrasted to Section 4, which is "Payment for Transmission Services Received". "Payment" therefore has two meanings: payment into the transmission fund by those receiving wheeling service versus payment from the fund as compensation for providing wheeling services. *"Method of determining such payments" refers to the administrative details set out in Section 5 for actual payment of wheeling revenues, apart from the "method of determining the division of transmission payments."*

the division of transmission payments and the method of determining the *administrative details associated with payments out* shall be subject to review and redetermination at the request of any transmitting party.

(Matter in italics supplied to replace "such payments" therein.)

It is the theory of the FPC, which the majority also apparently accepts, that there is a substantial distinction between (1) the "method of determining the division of transmission payments" and (2) the method of determining the administrative details *for the "division of transmission payments"* —i. e., for payments-out. It is submitted that this reasoning is untenable. That the parties would trouble themselves to make such an oblique reference to *"administrative details"* is a proposition with which it is difficult to agree. The determination of the method for the *"division of . . . payments"* would normally *include* the determination of "the administrative details [for the] . . . payments." This is particularly true because of the specificity with which section 4 prescribes the basis for the "division" of payments. The "administrative details" are part and parcel of the *"method* of . . . division . . ."* The FPC construction, therefore, in my opinion, is not tenable; it would interpret the contract provision essentially as stating the same thing twice, which is an unreasonable intent to ascribe to the parties. Redundancy in the construction of contracts is to be avoided if any other reasonable interpretation is possible.[10] Here, there is a reasonable interpretation: construe "the

method of determining the *division* of transmission payments" to mean exactly what it says and construe "such payments" to refer to "transmission payments." Such interpretation would conform to the interpretative rule of the last antecedent.[11]

In other words, the sentence at issue in section 5 refers to *two methods*—one for "determining the *division* of transmission payments" and the second for determining the *transmission payments* themselves. Since the *method* to be followed in determining the *division* of transmission payments necessarily includes the *administrative details* for the actual division of section 4 funds, the only other *method* to which the questioned portion of section 5 can refer is the method for determining transmission payments contained in section 4. Indeed, "payments . . . made under . . . Section 4" is the *entire* subject of section 5, and, as stated previously, the first sentence of section 5 refers explicitly to section 4 payments. So it is erroneous to view section 5 as having no relationship to section 4 payments. It should also be recognized that the critical phrase is "such *payments*." If that phrase was intended to refer to the *administrative details* for payments-out, it would have so stated. Accordingly, it is incorrect for the Commission to assert that the title of section 5 and its "context" support an interpretation limiting every provision of section 5 to the "division" of transmission payments. Thus, the majority err in stating that "such payments" in section 5 refers to "payments-out." The sentence actually refers to two *methods*: one for de-

---

10. *Frank v. Volkswagenwerk*, 382 F.Supp. 1394, 1400 (E.D.Pa.1974), *quoting General Mills, Inc. v. Snavely*, 203 Pa.Super. 162, 169, 199 A.2d 540, 544 (1964) ("No word in a contract is to be treated as surplusage or redundant if any reasonable meaning consistent with the other parts can be given to it . . .").

11. Since "such" is a qualifying word (in *"such* payments"), its meaning is ordinarily derived from the last antecedent, which is "transmission payments." *District 6, United Mine Workers v. U. S. Department of Interior Board of Mine Operations Appeals*, 183 U.S.App.D.C. 312, 316, 562 F.2d 1260, 1264 (1977); *Azure v. Morton*, 514 F.2d 897, 900 (9th Cir. 1975);

*Mandina v. United States*, 472 F.2d 1110, 1112 (8th Cir.), *cert. denied*, 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973); *Quindlen v. Prudential Ins. Co. of America*, 482 F.2d 876, 878 (5th Cir. 1973); *United States v. Pritchett*, 152 U.S.App.D.C. 307, 311, 470 F.2d 455, 459 (1972); *Mandel Bros. Inc. v. Federal Trade Commission*, 254 F.2d 18, 22 (7th Cir. 1958), *rev'd in part on other grounds*, 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); 73 Am.Jur.2d *Statutes* § 230 (1974). There is nothing in the content of the agreement, or in the negotiations prior to its execution, that would compel a different interpretation.

termining the *division* of transmission payments under section 5, and the other for determining the *consist* of the transmission payments under section 4.

Construing "such payments" to refer to the "transmission payments themselves," instead of to the administrative details of the division of those payments, is also more *reasonable* because this construction treats the payments-in and the payments-out with equal importance, as they deserve to be. Such interpretation does not "warp the plain meaning of Section 5 . . ." as New England asserted in its Application for Rehearing. Certainly if conditions change, there is as much necessity to consider making changes in the method of determining the transmission payments as there is in determining the method of their division. It would be extremely short-sighted for the parties to provide for possible alteration and arbitration of the method of making the divisions from the transmission fund without also doing the same for the method of determining the transmission payments which go into the fund that is subject to division. Indeed, it is curious to suggest that the parties would provide for the arbitration of *"administrative* details" and leave immune from the section 5 provision on arbitration the most important matter, namely, the composition of the "aggregate payments" which section 5 divides. Thus, I would hold that Central Maine's proposed modification of section 4, since it does not contain an annual rate schedule in conformance with section 4, cannot go into effect unless it be submitted for review to the parties under section 5 and, in the absence of their agreement, eventually to arbitration "as [thereinafter] provided," *i. e.*, as provided in section 7. Central Maine would also have to satisfy the "substantial change in conditions" requirement of section 4, if the other parties so insist.

Another major point that is completely destructive of the FPC's attempted construction, which would construe "such payments" as referring to "administrative details," is that *administrative details* are not a "method of determining the division of transmission payments." *Cf.* section 5.

The majority opinion, however, adopts this erroneous construction of the FPC decision (at —— of 187 U.S.App.D.C., at 1220 of 571 F.2d), and, in a manner similar to that of the FPC, refuses to come to grips with the plain language of the agreement, resting instead on the conclusory assertion that the "method of determining such payments" refers to "administrative details." *Id.*[12] The refusal of the majority opinion to attempt to meet the foregoing analysis of the relevant language constitutes an admission of the inability of the majority to do so.

*B. Testing an Alternative Interpretation*—A similar perplexing interpretation of the section 5 provision would result if the "method of determining such payments" were construed as referring to the only other "such payments" that the agreement refers to, *i. e.* "the payments-out of § 5." If the validity of such construction is tested by inserting its substance in the relevant sentence in section 5, that sentence would read as follows:

> If a substantial change in conditions occurs the foregoing method of determining the division of transmission payments [the pay-out formula] and the method of determining *the payments-out* shall be subject to review and redetermination at the request of any transmitting party.

(The italicized language replaces "such payments," in such construction.) Obviously, such reconstruction of this sentence in section 5 is inapt because then section 5 states

---

**12.** The pertinent language in the majority opinion states:

> The Transmission Agreement relates to two kinds of payments: the payments-in of § 4 and the payments-out of § 5. The FPC rejected NEPCO's contention that "the method of determining such payments" in § 5 refers to the § 4 formula for determining

payments in. Rather, the Commission determined that this phrase refers to administrative details associated with payments out. The Commission's reading is reasonable and we accept it.

(At —— of 187 U.S.App.D.C., at 1220 of 571 F.2d, footnote omitted).

the same thing twice. Nothing more need be said to make it clear that New England's interpretation of section 5 is the only reasonable construction of that provision of the contract.

*C. The Arbitration Claim*—Part and parcel of New England's position that unilateral revision to the extent attempted by Central Maine is not permissible is New England's contention that Central Maine was required by section 5 of the Agreement to submit its proposed modification to the parties, and, in the absence of agreement thereon, eventually to arbitration (App. 1057–1059). This contention is based on that sentence in section 5 which requires:

> If the transmitting parties are unable to agree as to what constitutes an equitable redetermination the matter shall be subject *to arbitration as hereinafter provided.*

The contract thus authorizes the review and redetermination of the transmission rates by the parties, and failing that, the italicized reference to arbitration constitutes a reference to paragraph 7 on *Arbitration* which states:

> Any dispute as to the interpretation or performance of this Agreement which cannot be settled by mutual agreement *shall* be submitted to arbitration [in the manner thereafter outlined].

Section 7 of the Maine Yankee Transmission Agreement of April 1, 1971 (emphasis added). *See* note 8. This entire controversy is a "dispute as to the interpretation [and] performance of [the] Agreement." *Id.* New England is thus acting fully within the provisions of sections 5 *and* 7 (to which 5 refers) of the Agreement in construing the contract to require arbitration of this controversy if Central Maine can meet the threshold requirement of showing the occurrence of a "substantial change in conditions." If this showing cannot be made, modification in that manner is proscribed. If eventual arbitration is thus required, the Commission should deny Central Maine's filing and leave the parties first to their review and next to the possibility of arbitration called for by their contract. In view of the well recognized preference for arbitration, and the potentiality of the arbitration to resolve completely the current controversy, relegating the parties to the procedures they have agreed upon would constitute a satisfactory solution of the problem.

## III. THE CONTRACTUAL MODIFICATION UPHELD BY THE COMMISSION WARPS THE PLAIN MEANING OF SECTIONS 5 AND 10 AND THE UNDISPUTED TESTIMONY AS TO BACKGROUND OF THE AGREEMENT

In these proceedings, the Commission found that

> the new rates resulting from [Central Maine's] modification of the Agreement are not unjust, unreasonable, or unduly discriminatory or preferential . . . .
> *After all it must be remembered that* [Central Maine] *receives no transmission services under the Agreement.*

App. 1051. The italicized language, which constitutes the very basis for the Commission's conclusion, illustrates the Commission's fallacious reasoning and how the terms of the agreement are distorted by its decision. It adjudicates a provision in the Transmission Agreement without considering the surrounding circumstances which brought that provision into being. The result, as New England contended before the FPC and this court, is a highly distorted modification of the contract.

In its Petition for Rehearing to the FPC, New England summarized its objections to the finding of the Commission by stating that it

> warps [13] the plain meaning of Sections 5 and 10 of the Agreement to relieve Cen-

---

**13.** Warp means "[16] To pervert, distort (the . . . judgement, principles, etc.) . . . 17. To distort, . . . misinterpret, give a false colouring to (a fact . . . etc.) . . 1741 Watts *Improv. Mind* I. viii, In matters of dispute take heed of warping the sense of the . . . writer to your own opinion . . . Of a statement: To become distorted." 12 Oxford English Dictionary 111 (1933). Webster's Third New International Dictionary 2557 (1961)

tral Maine and the other Maine utilities of transmission arrangements which they offered on favorable terms to induce non-Maine utilities to support the Wiscasset Atomic plant and which, the project having been built, they now seek to avoid. The Commission's interpretation of Sections 5 and 10 both does violence to the language of the sections and, at a critical point, is contrary to the undisputed testimony of witnesses for *both* parties as to the background of the language. The Commission's order in effect allows Central Maine to "end run" its Agreement with the non-Maine utilities and saddle those utilities with transmission costs which the Maine companies agreed to bear in enlisting support for the plant. New England's Power Company's Application for Rehearing, App. 1052–1053.

The magnitude of the benefit which Central Maine thus attempts to confer upon itself amounts to upwards of $1,100,000 annually. This was pointed out in New England's sworn Petition to Intervene:

> As can be seen the net gain to Central Maine rapidly rises from approximately $500,000 in 1973 to $750,000 in 1974 and to in excess of $1,100,000 in subsequent years. The net gain to Central Maine is made up by net losses to the other parties to the Transmission Agreement; including initial net losses to NEPCO and its affiliates of approximately $141,000 in 1973, $24,000 in 1974 and in excess of $200,000 in 1976 and 1977 and thereafter.

(App. 824–825). A footnote in the majority opinion states that "[Central Maine] receives under the modified rates $1,175,000." (At ⸺ of 187 U.S.App.D.C. n. 8, at 1216 of 571 F.2d n. 8). Since this is an annual rate, it appears that upwards of $17 million is involved from 1971 to 1985 when Central Maine asserts it will begin for the first time to pay the "postage stamp rate" paid by New England and others.

The reason why Central Maine "receives no transmission services" is because the generating plant is located at Wiscasset, Maine, which is the center of Central Maine's service area. Because of that location of the generating plant, Central Maine *does not need any transmission services.* As New England's Application for Rehearing and the "testimony of witnesses" to which it refers indicate, the generating plant was located *upon the request of Central Maine* at Wiscasset rather than at a location more central to all the parties to the Agreement (App. 1052). The Maine utilities wanted an atomic energy plant located in Maine. The other New England utilities agreed to the upstate Maine location only after Central Maine and the other Maine utilities had offered to pay the transmission costs in Maine and half of the transmission costs for service through New Hampshire and Massachusetts to two designated substations in Massachusetts (App. 204–5, 209–10, 429, 438). It was only after this offer by Central Maine that the utilities in Massachusetts and others far to the south of Wiscasset, acquiesced in the construction of the generating plant at Wiscasset rather than at a location more central to all the contracting parties. At this early date, it was clearly understood that Central Maine would assume a disproportionate share of the transmission costs because of the location of the plant at Wiscasset (App. 209–10, 215–16, 232–33, 352–53, 429, 433–38). The Maine utilities, according to the minutes of the critical director's meeting, committed themselves that "the *requisite* transmission in Maine will be taken care of by the Maine Companies" (emphasis added) (Ex. 5, Item 5) (App. 429, 1053).

Thereafter, the parties relieved Central Maine of a portion of that commitment by substituting the present Transmission Agreement which provides in writing that Central Maine should annually pay the

---

indicates a similar meaning: "to . . . twist out of shape . . . the occasional warping of logic and possibility . . . cause to judge, choose, or act wrongly . . . to . . . misinterpret." The allegation that the Commission "warps the plain meaning . .

of the Agreement . . ." is thus an attack upon the reasonableness of its construction of the agreement. The majority assert that "[t]he Commission's reading is reasonable . . ." (at ⸺ of 187 U.S.App.D.C., at 1220 of 571 F.2d).

same "postage stamp rate" on its "entitlement" to Maine Yankee electricity that is paid by the other purchasing utilities (App. 204–5, 209–10, 390, 438). This modification had the dual purpose of protecting the "postage stamp rate" and of providing a *quid pro quo* to New England for abandoning its opposition to unilateral modification (note 2, *supra*; App. 1056). Central Maine's agreement to make such payments represented a reduction of the *consideration* it had agreed to pay in the *future* for the *present* location of the Maine Yankee generating plant at Wiscasset. By agreeing to the construction of the plant at that location and by cooperating in its construction there, the more southerly utilities have *executed* their part of the bargain. The plant has been constructed at the site Central Maine requested, and now that the erection of the plant is complete, Central Maine seeks to avoid the reduced *consideration* the other utilities allowed it to pay in return for the southerly utilities agreeing to the Wiscasset site. If this attempt to escape payment of the promised *consideration* succeeds it will constitute a new peak for "Yankee" shrewdness—get the plant in your backyard; then, once the plant is at your location, force the other fellow to pay the added cost of transmission, which you had already agreed to pay.[14] The fact that all the parties would then be paying approximately the same costs cannot be said to be "reasonable" because to satisfy other objectives some of the parties had agreed to pay higher costs. In all equity, and by the contract, Central Maine should be held to the contract it induced.

Central Maine claims that it was the *intent* of the contracting parties, as evidenced by the terms of the contract, to permit it in this manner to escape *entirely* its contractual obligation to pay the "postage stamp

rate." The absurdity of this assertion as to the *intent* of the parties is self-evident when one recognizes the obvious fact that New England and the southern utilities would *not reasonably intend,* so far as their part of the contract was concerned, *completely* to surrender all the contractual consideration they were to receive after they had *completely executed* their half of the bargain. The southern utilities gave up their reasonable claim for a more economical central location and accepted Central Maine's offer of the Wiscasset site in return for Central Maine's agreement to pay the contractual transmission charge on its entitlement. Thus, when the plant was erected, Central Maine had received the complete consideration it bargained for, and short of returning that consideration which is now practically impossible, the most reasonable intent to be inferred from the contract and the surrounding circumstances is that Central Maine, unless relieved of that obligation in accordance with the terms of the contract, must continue paying the consideration that it agreed to pay to induce the parties to construct the plant at Wiscasset.

## IV. CONCLUSION

The pre-1971 understanding regarding Central Maine's obligations was clearly supplanted by the 1971 Agreement, but the pre-1971 history does elucidate the meaning of the Agreement: New England's support of Maine Yankee was induced by Central Maine's offer to assume a certain percentage of the transmission costs added by the Wiscasset location. Now Central Maine seeks to avoid paying *any* of those costs. Central Maine, as a party to the Transmission Agreement, agreed that any unilateral filing would be "with an annual rate" set in accordance with the method prescribed by

14. *Central Maine's contention that it did not realize until later that* two *transmission lines would be required to carry the electricity southward to the other utilities is contradicted by Exhibit 23 (App. 669) and the accompanying news release (App. 670–672). This advertisement which was released about January 27, 1966 included a map of New England with* two *transmission lines running south to connect with the other utilities outside Maine. The*

advertisement indicated these *two* 375 KV lines were "planned but not yet committed as to engineering and location" (Ex. 23, App. 669), and the news story stated that the "capacity in KW" for the "Maine . . . Nuclear [Plant]" was 700,000 KW. New England's Petition for Rehearing also cites the record as supporting knowledge in Central Maine, through its president and witnesses, at or about the January 27, 1966 date (App. 653–54).

section 4, a method which has been described above. But now Central Maine has filed a unilateral amendment which has the effect of eliminating entirely the annual rate insofar as it applies to Central Maine. One could say that Central Maine attempts, in effect, to substitute the franking privilege for its contractual obligation to pay the "postage stamp rate." When one considers the history of this Agreement, the unreasonableness and gross inequity of Central Maine's position is apparent. Indeed, Central Maine admits this inferentially when it states that it will voluntarily resume these payments in 1985 (Central Maine Br. at 24). The unilateral modification that Central Maine here attempts is totally inconsistent not only with basic standards of equity but also with the language of sections 4 and 5, and therefore should not be permitted.

For the foregoing reasons, in my opinion (1) the order of the Commission should be vacated; (2) the Commission should be ordered to refuse to file Central Maine's attempted amendment of February 14, 1973; and (3) if any of the other Maine utilities are in arrears in payments under the Transmission Agreement of April 1, 1971, they should be ordered to make them up.[15] I respectfully dissent.

### APPENDIX

Excerpts from the:

MAINE YANKEE TRANSMISSION AGREEMENT, dated as of April 1, 1971, between The Connecticut Light and Power Company, New England Power Company, Boston Edison Company, The Hartford Electric Light Company, Western Massachusetts Electric Company, Central Maine Power Company, Public Service Company of New Hampshire, Montaup Electric Company, Cambridge Electric Light Company, Bangor Hydro-Electric Company, Maine Public Service Company and Maine Electric Power Company, Inc. (hereinafter sometimes referred to as the "transmitting parties").

\* \* \* \* \* \*

4. *Payment for Transmission Services Received.*

Each purchasing utility shall pay a transmission charge at an annual rate per kilowatt of its Maine Yankee entitlement equal to the figure obtained by dividing the total annual costs of the New England main line transmission system by the total New England capability.

\* \* \* \* \* \*

In the event a transmitting party is required to pay a sales tax on or with respect to the sale of transmission services hereunder or a gross receipts tax on receipts from transmission services hereunder, the amount of such tax allocable to the sales or gross receipts from transmission services performed for a particular purchasing utility hereunder will be reimbursed by such purchasing utility to the transmitting party or parties required to pay the same.

Payments shall be made monthly,\* commencing with the first full calendar month following the "plant completion date" as defined in Section 2 of the Power Contracts, and shall be made to a fiscal agent, which shall be Maine Yankee Atomic Power Company or such successor agent as may be designated by Maine Yankee by vote of its board of directors.

Bills will be rendered by the fiscal agent for the account of the transmitting parties to each purchasing utility for whom transmission services are performed hereunder as soon as practicable after the close of each calendar month in such detail as the purchasing utility may reasonably request and shall be payable within ten (10) days after rendered. Bills may be rendered on an estimated basis subject to corrective adjustments in subsequent billing periods.

\* \* \* \* \* \*

5. *Payment for Transmission Services Rendered.*

The aggregate payments made by purchasing utilities under Section 4 hereof will be divided among the transmitting parties

---

**15.** There is some indication that the other Maine utilities have been making the required payments.

\* To be paid without regard to availability of Maine Yankee Power or of transmission lines.

so that each transmitting party shall receive, from the aggregate payments so made (after deducting any necessary accounting and administrative expenses of the fiscal agent referred to above) an amount representing its share (including that of any affiliate) of the total kilowatt miles of transmission capacity made available by all transmitting parties for the movement of Maine Yankee Power for others. Kilowatt-miles of transmission capacity made available by all transmitting parties shall be based on the estimated flow of Maine Yankee Power, assuming that Maine Yankee Power only flows over the main line transmission system from its source at the Maine Yankee unit to the purchasing utilities' points of delivery and with appropriate recognition being given to the added cost of underground transmission by multiplying each kilowatt mile of underground transmission capacity which is made available by 12.

\* \* \* \* \* \*

If a substantial change in conditions occurs the foregoing method of determining the division of transmission payments and the method of determining such payments shall be subject to review and redetermination at the request of any transmitting party. If the transmitting parties are unable to agree as to what constitutes an equitable redetermination the matter shall be subject to arbitration as hereinafter provided.

Receipts shall be distributed monthly, commencing with the first full calendar month following the "plant completion date" as defined in Section 2 of the Power Contracts.

\* \* \* \* \* \*

10. *Later Superseding Agreements.*

In the event any purchasing utility becomes a participant under a New England power pool agreement providing transmission services equivalent to those provided hereunder, such party shall be deemed to have accepted the terms of such New England power pool agreement with respect to such services and, commencing on the later of the date upon which such party becomes such a participant or the date such New England power pool agreement becomes ef-

fective, such services will be provided to such party under and in accordance with the terms of said New England power pool agreement. Each transmitting party reserves the right to submit for filing without the concurrence of any other party a New England power pool agreement and from time to time other rate schedules (with an annual rate determined in accordance with the method set forth in Section 4 hereof) modifying or superseding this Agreement and each party reserves the right to object to any such New England power pool agreement and other rate schedules in accordance with Federal Power Commission rules and regulations.

R. 389–93.